******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DISCIPLINARY COUNSEL *v.* JOHN R. WILLIAMS
(AC 37319)

Lavine, Beach and Mullins, Js.

*Argued March 7—officially released June 28, 2016*

(Appeal from Superior Court, judicial district of New Haven, Blue, J.)

*Norman A. Pattis*, with whom, on the brief, was *John R. Williams*, self-represented, for the appellant (defendant).

*Karyl L. Carrasquilla*, chief disciplinary counsel, with whom was *Desi Imetovski*, assistant chief disciplinary counsel, for the appellee (plaintiff).

*Charles Kurmay* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Opinion*

MULLINS, J. The defendant attorney, John R. Williams, claims in relevant part that his right to due process was denied when the court failed to provide him with proper notice of a disciplinary hearing and a meaningful opportunity to be heard before rendering a judgment suspending him from the practice of law for twenty days. We agree and, accordingly, reverse the judgment of the trial court and remand the case for a new hearing.

The following facts, which are ascertained from the record and are not in dispute, inform our review. There are two underlying cases that are relevant to the instant matter; one is a state court case and the other is a federal court case.

In the state court case, Williams represented criminal defendant Angelo Reyes during the course of Reyes' trial in the judicial district of New Haven. In that case, Reyes had been charged with two counts of arson in the second degree in violation of General Statutes § 53a-112 (a) (2), two counts of conspiracy to commit criminal mischief in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-115 (a) (1), and conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-101 (a) (1).

Before facing these charges in state court, however, Reyes had been tried in federal court on similar charges. He was acquitted of those federal charges.

As jury selection was about to begin in the state court case, the court discussed with Williams and the prosecutor the federal court case in which Reyes had been acquitted. In particular, the court discussed the fact that counsel had met in chambers and agreed that the jury verdict in the federal case would not be mentioned during voir dire in Reyes' state court case. The court then stated: "And second . . . during the trial itself, the federal jury's verdict will not be mentioned by counsel or witnesses without prior permission of the court, and, if somebody wants to bring it up, it's a simple matter to say, Your Honor, may the jury be excused, and then, you know, address me seeking permission if that seems appropriate." The court then asked if that was agreeable to the parties, and both the prosecutor and Williams said "yes."

Following jury selection, the court clarified that Williams had no outstanding motions on behalf of Reyes, which Williams confirmed, and it then addressed an outstanding motion in limine that the state had filed concerning the use of information from Reyes' federal court trial. The court reiterated its earlier ruling that "there was to be no mention of the verdict in the federal trial without prior consent of the court," and it asked the prosecutor if he was seeking an order that was even broader than that. After further discussion among the

prosecutor, Williams and the court, the court then stated: "I'm going to stick with my original order, which is that the outcome of the federal proceeding may not be mentioned in the jury's presence without prior consent of the court."[1]

On October 1, 2014, during the evidentiary portion of Reyes' trial, the state called to the witness stand one of Reyes' alleged coconspirators, Osvaldo Segui, Sr.[2] During direct examination, Segui testified in part about a specific plea agreement he had with federal authorities and his expectations related to his pending state criminal charges. On cross-examination, Williams inquired about, inter alia: Segui's conviction in his federal criminal case; the plea agreement Segui had with the federal prosecutor for a sentence that was less than the mandatory minimum sentence; the fact that Segui had testified against Reyes in Reyes' federal criminal trial as part of Segui's plea agreement for, inter alia, a reduced sentence; Segui's pending state charges; and Segui's agreement with the state, which was contingent on his testifying for the state in Reyes' state criminal trial. During cross-examination, the following colloquy occurred between Williams and Segui as Williams attempted to impeach Segui with a transcript from Segui's federal court sentencing hearing:

"Q: Isn't it true, Mr. Segui, that in your presence, Assistant United States Attorney McConnell said—and counsel, for your benefit, it's page eleven: '. . . the verdict in the case is immaterial.' Do you remember him saying that?

"A: I don't understand that—material stuff.

"Q: You don't know what the word immaterial means?

"A: No, I don't.

"Q: It means it doesn't matter.

"A: Okay.

"Q: That was, in fact, your—that was, in fact, what the government told you; isn't that right?

"A: I don't recall it, but yes—yes.

"Q: All right. And then the [federal] judge spoke, and Judge Shea addressed you directly as well as the other people in the courtroom, do you remember that?

"A: Yes. . . .

"Q: Do you remember that Judge Shea said, 'I also want to add, I echo what Mr. McConnell said. *While your assistance did not result in a conviction*, the fact is—'

"[The Prosecutor]: Objection.

"The Court: Sustained. The jury will step out." (Emphasis added.)

After the jury was excused, the colloquy continued:

"The Court: Mr. Williams, I respect you a great deal, but you have expressed your outrage several times already at various things that happened. I think that this is actually pretty outrageous, because we specifically addressed the question of whether the jury should be informed of what [was] the outcome of the federal trial before, and it was agreed that you were not to mention that without the specific consent of the court, and you—you should know that if you wanted to get into this, you needed to obtain my consent prior to mentioning this in front of the jury.

"Attorney Williams: You Honor, if I may.

"The Court: Please.

"Attorney Williams: I know that at an earlier stage of the proceeding that was said, however, subsequently in this room before Your Honor, on the record, when the state raised its—one of its motions in limine concerning the outcome of the federal case, we discussed at length the fact that this witness' testimony here and his understanding is profoundly influenced by everything that happened—

"The Court: Nevertheless, you needed my permission, and you did not get it.

"Attorney Williams: It was my understanding that Your Honor, by that order, was granting permission. I—

"The Court: Your understanding is entirely erroneous, and you should know that. We will consult—in due time, transcripts will be consulted. You are certainly way out of line. Does the state wish a mistrial?"

The prosecutor requested time to consult with his colleagues on the matter and indicated that he would like until 2 p.m. to decide whether to seek a mistrial. The court then stated in relevant part: "Mr. Williams, you are way out of line, and I will just tell you right now—and I'm going to ask you if there's going to be any doubt in your mind after I do this—that if you wish to mention or even imply the outcome of the federal trial before the jury in this case, you must get my express permission to do so. Is that clear?" Williams responded: "Yes it is, Your Honor." The court then recalled the jury, told it to "ignore the previous question," and permitted cross-examination to continue until the 1 p.m. luncheon recess.

Following the luncheon recess, the court inquired as to whether the prosecutor was seeking a mistrial. The prosecutor stated that he was not seeking a mistrial but that he would like the court to give a curative instruction, to which the court agreed. The court then addressed Williams:

"The Court: Mr. Williams, I'll just say now, I'm not gonna—I know you're in the middle of a criminal trial, and you're, of course, one of the—not only an experi-

enced attorney but one of the most experienced attorneys in the state. . . . Having said that, I have certain responsibilities. I view what happened today as . . . a very grave matter. I have asked the court reporter to order—I've ordered two transcripts; one is the transcript of what happened at [12:40 p.m.] today, and the other . . . [is] the transcript of my pretrial order relating to this.

"*What I'm going to do in addition [to] this is give you an opportunity—and this is not an urgent matter since a mistrial has not been declared—but with all deliberate speed as we can . . . to order a transcript of whatever may have occurred in court between my pretrial order and what happened at [12:40 p.m.] that you say may have allowed you to do what you did, and all of that can be taken into account in a hearing that will be scheduled after the conclusion of this trial.*

"That's all I'm going to say right now, but you stand . . . alerted both to the fact that this court views the matter as very serious, and the court unhappily—and I emphasize unhappily—*will have to pursue the matter, but only after a fair hearing and giving you an opportunity . . . to order a transcript of anything that may have occurred in court that . . . may . . . mitigate the situation.* Is that clear?

"Attorney Williams: It is." (Emphasis added.)

The court proceeded to recall the jury and give a curative instruction,[3] and Williams resumed cross-examination of Segui. On October 7, 2014, after the close of evidence, counsel engaged in closing arguments. Williams argued, in part: "Without a doubt, [Segui and his son] had a strong motivation to testify falsely. I know you were told and they recited the usual language—well . . . I'm only gonna get all . . . these perks, I'm gonna get these good things . . . if I tell the truth. But, you'll recall that both of them admitted that when they were in federal court, after having testified in federal court, and they came up to be sentenced for the crimes of which they are guilty, of which they admitted that they were guilty, what did the judge tell them? It's not—I'm not the one who decides whether they're telling the truth. The only person who decides is the prosecutor. If you please the prosecutor, you get the credits, and, in that particular [case], what did they get? They had [pleaded] guilty to crimes—not, by the way, crimes charged in this case—other crimes entirely, federal crimes, *of which my client has never been convicted.* They [pleaded] guilty to those crimes carrying a mandatory minimum sentence set by the Congress of the United States, a mandatory minimum sentence of at least seven years in prison, mandatory. And what did they get? In one case, three years. In the other case, four [years]." (Emphasis added.)

Williams continued his summation, which encom-

passes several pages of transcript. Following closing argument, out of the presence of the jury, the prosecutor indicated to the court that, although he had not wanted to interrupt Williams during his summation, he objected to Williams' statement during closing argument that his client had not been convicted of any federal crime. The court indicated that it also saw this as troubling and stated that a hearing would be held on the matter.[4]

On October 9, 2014, the jury returned a guilty verdict on all counts against Reyes, and the court then scheduled a bail hearing for 2 p.m. that same day. Immediately following the bail hearing and the release of Reyes on bail with certain conditions, the court excused the prosecutor, and it requested that Williams remain in the courtroom. Immediately thereafter, the court proceeded to hold a hearing on Williams' actions and the possibility of sanctions.

Williams told the court that he was not prepared to go forward at that time because he "had not anticipated that this hearing would be held this afternoon because [the court] had previously indicated that [he] would be given an opportunity [to] obtain such transcripts as [he] needed and review them in preparation [for the hearing]." Williams then informed the court that he had ordered the transcripts as the court had instructed him to do, but that they had not yet been delivered. As a result, he explained, he, therefore, had not had time to prepare for a hearing. Notwithstanding Williams' protestations, the court proceeded with the hearing, found that Williams had violated the order of the court on more than one occasion, and sanctioned him by suspending him from the practice of law for twenty days. This appeal followed.

On appeal, Williams argues that the court caught him off guard at the end of his client's bail hearing by immediately holding a hearing regarding his actions during his client's trial. He argues that he tried to explain to the court that he was not prepared and that the court specifically had told him that he would be given time to obtain a transcript and to prepare for a hearing that would be scheduled after Reyes' trial. He contends that trial does not end until after sentencing and that it certainly does not end with a contested bail hearing. He further argues that he "was given no opportunity at all to prepare to meet the accusations against him, and, in fact, was not even given notice that his summation would be considered a separate ground for discipline." Under the particular circumstances of this case, we agree that Williams was not given adequate notice of and time to prepare for the hearing in which the court found him in wilful violation of its orders and ordered him suspended from the practice of law for twenty days.

"It is well established that [j]udges of the Superior Court possess the inherent authority to regulate attorney conduct and to discipline the members of the bar.

. . . It is their unique position as officers and commissioners of the court . . . which casts attorneys in a special relationship with the judiciary and subjects them to its discipline. . . .

"In attorney disciplinary proceedings, two interests are of paramount importance. On the one hand, we must not tie the hands of . . . courts with procedural requirements so strict that it becomes virtually impossible to discipline an attorney for any but the most obvious, egregious and public misconduct. On the other hand, we must ensure that attorneys subject to disciplinary action are afforded the full measure of procedural due process required under the constitution so that we do not unjustly deprive them of their reputation and livelihood." (Citations omitted; internal quotation marks omitted.) *Sowell* v. *DiCara*, 161 Conn. App. 102, 129–30, 127 A.3d 356, cert. denied, 320 Conn. 909, 128 A.3d 953 (2015); see *Thalheim* v. *Greenwich*, 256 Conn. 628, 649, 775 A.2d 947 (2001) ("At their core, the due process clauses of the state and federal constitutions require that one subject to a significant deprivation of liberty or property must be accorded adequate notice and a meaningful opportunity to be heard. . . . These requirements apply to the imposition of sanctions [on attorneys]." [Citations omitted; internal quotation marks omitted.]).

"Suspension [of an attorney] may be summary, and is an inherent power of the . . . court. . . . As long as there is no denial of due process . . . [a court] may, for good cause, discipline attorneys who practice before it by suspending them from practice . . . for a reasonable and stated period." (Citation omitted.) *In the Matter of Presnick*, 19 Conn. App. 340, 351, 563 A.2d 299, cert. denied, 213 Conn. 801, 567 A.2d 833 (1989).

"To satisfy the requirements of due process, attorneys subject to disciplinary action must receive notice of the charges against them. . . . [T]he notice afforded to an attorney subject to a disciplinary hearing may be oral or written, as long as it adequately informs the attorney of the charges against him or her *and allows him or her to prepare to address such charges*. Similarly, an attorney subject to disciplinary proceedings must be given reasonable notice of the charges against him or her before the proceedings commence . . . ." (Citations omitted; emphasis altered; internal quotation marks omitted.) *Burton* v. *Mottolese*, 267 Conn. 1, 20–21, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004). In addition, "ordinarily due process would require that a hearing be held before sanctions can be imposed . . . ." *In the Matter of Presnick*, supra, 19 Conn. App. 351; see *Briggs* v. *McWeeny*, 260 Conn. 296, 318, 796 A.2d 516 (2002).

In this case, it is clear that the court did not issue a summary suspension. See Practice Book § 2-45. Here, the court told Williams that it would schedule a hearing

after Reyes' trial. The court then informed Williams that he could order transcripts so that he would be prepared for that hearing. The court further explained to Williams that, at that hearing, Williams would be permitted to present his argument to the court that demonstrated that he did not wilfully violate the court's order.

Specifically, the court told Williams during the October 1, 2014 proceedings that "this [was] not an urgent matter since a mistrial ha[d] not been declared [but that he should] order a transcript of whatever may have occurred in court between [the court's] pretrial order and what happened at [12:40 p.m.] that . . . may have allowed you to do what you did, and all of that can be taken into account in a hearing *that will be scheduled* after the conclusion of this trial." (Emphasis added.) On that direction, Williams did order a transcript of the proceedings.

When the court, on October 9, 2014, immediately following Reyes' contested bail hearing, told Williams to remain in court and then proceeded to conduct a disciplinary hearing, Williams, as soon as the court gave him an opportunity, informed the court that he was not prepared to go forward at that time. He explained that he had not anticipated that the hearing would be held at that moment given that the court had told him to order a transcript in order to prepare for a hearing, which he had done. He also explained that the transcript was not yet available from the court reporter. The court, nevertheless, proceeded to conduct the hearing, for which Williams had not been given time to prepare.[5]

In sum, although the court clearly wanted to address this extremely serious matter as soon as possible, it, nevertheless, did not rule summarily at the time of the conduct that it found offensive.[6] See Practice Book § 2-45. Rather, the court told Williams that he should order the relevant transcripts and be prepared for a hearing that *would be scheduled* after Reyes' trial and at which Williams would be given the opportunity to try to explain why his conduct was not a violation of the court's order. Williams, thus, was entitled to a properly noticed hearing regarding his conduct and whatever sanction might be appropriate, and he was entitled to time to prepare for that hearing. Accordingly, the judgment must be reversed and the case remanded to the trial court for a new hearing.

The judgment is reversed and the case is remanded for further proceedings.

In this opinion the other judges concurred.

[1] The entire colloquy regarding the state's motion in limine was as follows:

"The Court: All right. Good morning. I've had a productive meeting at sidebar with counsel about the motions that are pending. Right now, Mr. Williams, as I understand, there are no defense motions that are claimed at this time?

"Attorney Williams: That's correct, Your Honor.

"The Court: Thank you. Turning to state motions, let me just go through this. First, I have a motion in limine regarding the federal trial. It was unclear at sidebar whether this seeks any relief other than what the court has

previously ordered. The court previously ordered—and I believe there was no exception to this order—that there was to be no mention of the verdict in the federal trial without prior consent of the court. That's what the court ordered.

"Obviously, it seems to me that if any witness for either party testifies and then on cross-examination the opposing party seeks to impeach that witness with some sort of prior inconsistent statement, it can always be said, sir, at a prior proceeding, did you not, on, you know, whatever date it is, did you not say that; and, that could certainly be done without mentioning the verdict. I don't know . . . whether you're seeking . . . any broader ruling of the court.

"[The Prosecutor]: Not necessarily, Your Honor. I think the language that I—

"The Court: Not necessarily. Well, just tell me what you are seeking.

"[The Prosecutor]: Absolutely. Well, I think the language I use is a bit broader in the request because I think we'll go down a slippery slope if we start mentioning the investigations and the involvement of the federal case. We're just trying to avoid that, going down to the verdict and to the jury and—

"The Court: Well, sure, but when a witness testifies—well, first, in terms of investigations, I'm guessing there's going to be prosecution witnesses who have investigated both the federal and the state case.

"[The Prosecutor]: But we're not intending to elicit any testimony regarding the other matters.

"The Court: Yes, but, certainly, that may be the case, but somebody can always be asked—I mean, if, for example, somebody can always be asked if he's aware of a fact and somebody could've become aware of a fact through a prior investigation, and it's not my rule to hamstring the defense on this. In fact, I think that while questions . . . can certainly be put in some sort of way that doesn't specifically name a prior investigation, at some point, it may become necessary to bring to the jury's attention that there was some sort of prior proceeding—for example—what I certainly anticipate—and this could be the case with either side—is that if any witness called by the prosecution or by the defense testifies in a way that is perceived to be different from their testimony in the federal proceedings, that witness can certainly be asked, is it not true, sir, that in a prior proceeding you said X, Y and Z? I don't see any way around that, and I've certainly had many cases like that where that's, for example, I've had several trials that have followed a mistrial; more benignly, it frequently happens that, say, a police officer or civilian witness might testify in motions perhaps, and then maybe testifies a little bit differently on the stand, and the way the lawyers usually couch the question is, sir, isn't it true that in a prior proceeding, you said X, Y, and Z.

"[The Prosecutor]: I think that's perfectly appropriate. I'm not in any way trying to limit the use evidentiary-wise of a prior consistent or inconsistent—

"The Court: So, that it may well come to the jury's attention it was some sort of prior proceeding. I don't know that it has to be identified.

"[The Prosecutor]: That's our concern.

"The Court: So, Mr. Williams, I'm certainly not here to hamstring you, and I can imagine circumstances in which the jury might have to know that there was a prior federal trial. But, I'm wondering if, for the most part, you could at least preliminarily be content with a form of the question, sir, in a prior proceeding on whatever date it was, did you not testify as to X, Y, and Z? That sort of thing.

"Attorney Williams: Well, in that particular sort of situation, of course, that's traditionally the way we do it.

"The Court: Sure.

"Attorney Williams: But there's much more to it in this case. I mean, for heaven's sake, they're bringing in [Federal Bureau of Investigation] agents.

"The Court: Sure.

"Attorney Williams: [Federal Bureau of Investigation agents] don't conduct investigations of state cases. I mean, how am I going to . . . examine them on direct? How am I going to cross-examine them?

"The Court: Well, I guess that we'll have to see. Yeah.

"Attorney Williams: And we have all of these cooperation agreements. Those cooperation agreements aren't with the state's attorney; they're with the U.S. attorney . . . and the—

"The Court: So maybe—so the rabbit may be well out of the hat.

"Attorney Williams: Well out of the hat.

"The Court: Yeah. You know . . . at this point, here's what I'm going to do with the state's motion. I'm going to stick with my original order which is that the outcome of the federal proceeding may not be mentioned in the jury's presence without prior consent of the court. It seems to me what Mr. Williams says is intuitively correct to me, that it will just have to be obvious when [Federal Bureau of Investigation] agents and the like testify or perhaps when a cooperation agreement comes into evidence that there was some

sort of prior federal proceeding. That's something the court can live with, and, I mean, the most important thing is that the relevant evidence comes out. Whether the outcome of the federal proceeding is relevant—you know—right now, I don't see it. I mean, any—I go on the assumption anything is possible, but my prior consent has to be obtained.

"So I'm not here to . . . force everybody into awkwardness by any means. I don't think it's particular[ly] prejudicial to either party for the jury to know that there may have been some sort of prior federal proceeding [in] which all these . . . agents and the like were investigating, [in] which some witnesses . . . may have signed cooperation agreements. We just have to see. So, at any rate, that's my order."

[2] Both Segui and his son, Osvaldo Segui, Jr., were alleged to have been Reyes' coconspirators, and both were convicted in federal court after entering into plea agreements. Additionally, both Segui and his son testified against Reyes in Reyes' federal court trial and in his state court trial.

[3] The court gave the following curative instruction: "Ladies and gentlemen, I just want to give you one instruction concerning the question that was put to you about the federal [judge's] sentencing remarks—this was [at approximately 12:40 p.m.] and you'll recall there was a question and you were excused. First, the objection to that question has been sustained, it's not part of the evidence; you should disregard it.

"Second, it's no secret . . . that there was a federal proceeding in the fall of 2013 at which this witness . . . testified [and] in which Mr. Reyes was also involved, but the subject matter of the federal trial and the subject matter of this are quite different subject matters, and whatever happened in that trial, one way or the other—and there's no evidence of what happened in that trial one way or the other—must have no bearing on what happens here because your sworn duty as jurors in this case . . . is to decide the case based exclusively on the evidence presented in this court, and the legal instructions you're given by the court at the end of the case."

[4] After the prosecutor indicated that he had a concern with Williams' closing argument, the following colloquy occurred:

"[The Prosecutor]: Yes. I just have a comment to make in regards to defense counsel's closing. . . . The comment that I was concerned about was in reference to—during the course of Mr. Williams' comments, he made a comment to the effect of—in referencing the federal convictions of [Mr. Segui and his son]—there was a comment to the effect of—and you recall those are crimes of which my client was never convicted.

"The Court: I noticed that as well. Mr. Williams, the state did not object. I didn't want to interrupt, but, you know, I've explained already that this is a very grave matter.

"Attorney Williams: That wasn't—

"The Court: I have ordered a transcript from the reporter, and as I have told you, following the jury's verdict, there will be a hearing on what I have to do with you. I am not looking forward to that, but there will be such a hearing, at which point you will be allowed to say anything you want in your defense, but you must know that that remark certainly wouldn't be chalked in your favor.

"Attorney Williams: You Honor, that remark was in no way a violation of your order. Your Honor, in fact—

"The Court: That's what you say.

"Attorney Williams: Well, it's more than that. The state elicited evidence, as I recall—

"The Court: You said crimes of which your client has never been convicted.

"Attorney Williams: That's correct.

"The Court: That's a clear—well—

"Attorney Williams: I never—

"The Court: —it may be correct, but we have no evidence—evidence one way or the other of which—of what the outcome of the federal proceeding is.

"Attorney Williams: There's no evidence that he was even charged with the crimes that they [pleaded] guilty to. That's my point.

"The Court: Nevertheless, there is no evidence of the outcome of any federal proceeding, and we know that the court had repeatedly given orders on this. I'm not looking for argument at this time. *You will be given an opportunity to say anything you want in your defense at the sanctions hearing*, but you are—I am very sad to say—digging a grave that was pretty deep already, and that I'm going to have to consider in doing things that . . . I don't want to do." (Emphasis added.)

[5] We are aware that the court also told Williams, following his summation, that a hearing would take place following the jury's verdict. In light of the court's earlier statement, we are not persuaded that this statement gave

Williams notice that the hearing would take place immediately after the bail hearing, or that it gave him adequate time to obtain the necessary transcripts and prepare for that hearing.

[6] We offer no opinion as to whether due process would permit the court to order a suspension from the practice of law in a summary proceeding.

---