******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ERICA LAFFERTY ET AL. *v.* ALEX
EMRIC JONES ET AL.
(AC 46194)

Bright, C. J., and Moll and Prescott, Js.

*Syllabus*

The plaintiff in error, P, the attorney for J and several other defendants in
the underlying consolidated actions, filed a writ of error challenging the
order of the trial court suspending him from the practice of law for a
period of six months. The plaintiffs in those actions, including certain
family members of those killed in the mass shooting at the Sandy Hook
Elementary School in Newtown, had filed suit against J and the other
defendants as a result of J's use of his nationally syndicated radio
program and Internet websites he owned to publish content proclaiming
that the mass shooting was a staged event. During trial, the court issued
a protective order concerning sensitive personal and confidential infor-
mation about the plaintiffs that the defendants had obtained through the
discovery process. The order limited use of the information to counsel
of record and others involved in the preparation and litigation of the
underlying actions. The plaintiffs' confidential information was released
during the course of communications P had with attorneys in Texas,
including R, about related actions pending there and the possible collabo-
ration between P and R on the cases in both states. During that time
period, L, a Texas attorney, filed a bankruptcy petition for several defen-
dants in the Texas cases. L then contacted W, who was counsel prior
to P for several of the defendants in the underlying Connecticut actions,
and requested access to all of the discovery materials obtained in the
Connection actions. W then emailed L and P, warning that L might
not be authorized to access the confidential documents in light of the
protective order. Later that day, L obtained copies of the protective
order. P did not ask L to sign a confidentiality order, and L was not
informed by P or anyone from P's law firm that the discovery materials
he was being provided included the plaintiffs' confidential information.
A, an attorney in P's law firm, then emailed L, asking him to give R a
hard drive that contained the confidential information. L responded to
A's email, stating that he already had given the hard drive to R, who
also was not asked to sign a confidentiality agreement. Neither L nor
R had filed an appearance in the Connecticut cases. P thereafter
informed M, the plaintiffs' counsel in the Connecticut actions, about
the release of the confidential information. The trial court learned from
media reports that the plaintiffs' confidential information had been
released to unauthorized individuals. The court, sua sponte, then sched-
uled a hearing requiring P to appear and show cause as to whether he
should be referred to disciplinary authorities or sanctioned by the court

as a result of the disclosure of the plaintiffs' confidential information. After the court stated during the show cause hearing that it would not refer the matter to disciplinary authorities but would instead conduct disciplinary proceedings itself, P filed motions to dismiss the show cause order and to disqualify the court from presiding over the disciplinary proceedings. P claimed that the court's impartiality might reasonably be questioned as a result of its decision to conduct the disciplinary proceedings, rather than to refer the matter to disciplinary authorities, as well as the court's statements during the show cause hearing about the dismissal of a grievance complaint against P three years earlier that pertained to an affidavit he had filed in the underlying actions. The court denied both motions and thereafter found, by clear and convincing evidence, that P had violated several Rules of Professional Conduct and suspended him from the practice of law. On P's appeal to this court, *held*:

1. P could not prevail on his unpreserved claim that the trial court violated his right to procedural due process by initiating disciplinary proceedings against him on the basis of events that occurred outside of the court's presence: after weighing the factors set forth in the balancing test for procedural due process claims under *Mathews* v. *Eldridge* (424 U.S. 319), this court was not persuaded that due process mandated the imposition of a constraint on the trial court's inherent authority to regulate attorney conduct and to impose discipline by distinguishing between conduct that occurred before the court and conduct that transpired outside of the court's presence, as P was afforded notice and an opportunity to defend his interests, nothing in the record indicated that the disciplinary proceeding was tainted by publicity surrounding the underlying actions, and this court did not discern that the trial court's decision to conduct the disciplinary proceeding placed P's property interest in his law license at risk of an erroneous deprivation; moreover, although P contended that the trial court's ability to refer the matter to disciplinary authorities mitigated any adverse effect on the court's interests in managing its docket and protecting the rights of other parties, the court had a significant interest in immediately adjudicating the serious allegations against P, which enabled the court to inquire promptly into the matter.

2. P could not prevail on his claim that the trial court abused its discretion in denying his motion to disqualify the court from presiding over the disciplinary proceedings: this court could not conclude that the trial court's impartiality reasonably could be questioned as a result of the court's statements about the dismissal of the earlier grievance complaint against P and its decision to conduct the disciplinary proceedings rather than to refer the matter to disciplinary authorities, the court having explained on the record that its recitation of the background of the underlying actions, including the dismissal of the grievance complaint against P, constituted an effort to conduct fair and transparent disciplinary proceedings and to accommodate P's counsel, who had recently

appeared on behalf of P and had requested a continuance for medical reasons; moreover, because P did not claim that disqualification of the trial court was required on the ground of actual bias, P did not present a viable due process claim that would be subject to this court's plenary review.

3. The trial court improperly determined that P violated certain Rules of Professional Conduct pertaining to his handling of the plaintiffs' confidential information and violation of the protective order, as well as his sponsoring of an out-of-state attorney in Connecticut:

a. This court concluded that the trial court correctly applied rule 1.1 of the Rules of Professional Conduct in finding that P failed to act competently in handling the plaintiffs' confidential records; contrary to P's contention that rule 1.1 was inapplicable to him in the circumstances of this case because it makes no mention of an attorney's duty to persons other than his client, to provide competent representation in accordance with rule 1.1, an attorney must responsibly engage in discovery and safeguard sensitive discovery materials, whether provided by the client or produced by an opposing party, and P's conduct ran the risk of subjecting the defendants he represented to sanctions.

b. The trial court incorrectly determined that P violated rule 1.15 (b) of the Rules of Professional Conduct, which addresses the safeguarding of funds and financial information but does not encompass discovery materials such as the plaintiffs' confidential records: contrary to the trial court's interpretation of the phrase "[o]ther property" in rule 1.15 (b) as encompassing the plaintiffs' confidential records, this court's reading of rule 1.15 as a whole and its application of the rule of statutory construction requiring that terms be assigned their ordinary meaning, led it to construe the phrase "[o]ther property" as excluding discovery materials; moreover, the majority of the provisions of rule 1.15 expressly address, in whole or in part, matters that are financial in nature; furthermore, the commentary to rule 1.15 did not support the trial court's assertion that the plaintiffs' records were included within the meaning of "[o]ther property," as the commentary expressly provides guidance on safekeeping moneys and securities, neither of which is similar to discovery materials produced during litigation.

c. The trial court incorrectly determined that P violated rule 3.4 (3) of the Rules of Professional Conduct, which addresses an attorney's obligation to obey a court's directives: the record did not establish by clear and convincing evidence that P knowingly disobeyed the requirements of the protective order, as the evidence did not support the court's finding that P had actual knowledge of the fact that the hard drive that was transferred by A, a subordinate attorney in P's law firm, to L, and then to R, contained the plaintiffs' confidential information; moreover, P's statements in an email addressed to M, the plaintiffs' counsel in Connecticut, about the transfer of the hard drive did not constitute clear and convincing evidence that P had actual knowledge that the hard drive

contained the plaintiffs' confidential information, and an email P received from W, warning about the protective order, did not show that P knew he was violating the protective order when he directed A to send the hard drive to L and R.

d. The evidence was not adequate to support the trial court's determination that P violated rule 5.1 (c) of the Rules of Professional Conduct, which expresses a general principle of personal responsibility for the acts of another, to the extent that P acted as the sponsoring attorney in Connecticut for R, who had not filed an appearance in the underlying actions at the time of the unauthorized disclosure to him of the confidential records: P was not involved in R's inadvertent disclosure of the confidential documents to B, the plaintiffs' counsel in the Texas case, and there was no evidence that P gave R improper directions with regard to the confidential records or that P knowingly ratified R's disclosure of the confidential records; moreover, clear and convincing evidence did not exist establishing that P knew of R's conduct at a time when remedial action could have been taken to avoid or mitigate its consequences, and there was insufficient evidence to establish that P knowingly authorized the transfer of the confidential records or that he knew they had been disclosed prior to informing M that they had been released; furthermore, this court rejected P's assertion that the trial court improperly applied rule 5.1 (b) and (c) concerning the exercise of his supervisory authority over A, as it was implicit in the trial court's decision that P did not make reasonable efforts to ensure that A conformed to the Rules of Professional Conduct under rule 5.1 (b) and that A violated the rules for purposes of rule 5.1 (c).

e. P could not prevail on his claim that his actions did not fall within the scope of rule 8.4 (4) of the Rules of Professional Conduct, which addresses conduct that is prejudicial to the administration of justice: the trial court correctly applied that rule in finding that P improperly permitted the disclosure to unauthorized persons of the plaintiffs' personal and sensitive information and that his misconduct unilaterally imposed a significant cost on the plaintiffs in their attempt to obtain justice in the underlying actions; moreover, despite P's assertion that his failure to properly maintain records did not affect the trial process or the court's administration of justice, as well as his claim that there was no evidence that he insulted or criticized the trial court or attempted to hinder the disciplinary proceedings, this court found P's restrictive interpretation of rule 8.4 (4) to be untenable, as his mishandling of the plaintiffs' confidential records fell within the expansive range of misconduct encompassed by rule 8.4 (4).

4. In light of this court's conclusion that the trial court improperly determined, in whole or in part, that P had violated rules 1.15 (b), 3.4 (3) and 5.1 (c) of the Rules of Professional Conduct, the disciplinary order, which was not predicated on P's violation of any particular rule, could

not stand; accordingly, the case was remanded to the trial court for a new hearing on sanctions before a different judge.

Argued January 2—officially released May 28, 2024

*Procedural History*

Writ of error from the order of the Superior Court in the judicial district of Waterbury, *Bellis, J.*, suspending the plaintiff in error from the practice of law for a period of six months; thereafter, the defendants in error each filed a motion to dismiss; subsequently, this court granted the motion to dismiss and dismissed the writ of error as to the defendant in error *Hon. Barbara N. Bellis* and denied the motion to dismiss as to the defendant in error Office of Chief Disciplinary Counsel; thereafter, the court, *Bellis, J.*, denied the motion for a stay of its order filed by the plaintiff in error; subsequently, the court, *Bellis, J.*, issued an articulation of its decision. *Writ granted in part*; *order vacated*; *further proceedings*.

*Christopher T. DeMatteo*, for the appellant (plaintiff in error Norman A. Pattis).

*Brian B. Staines*, chief disciplinary counsel, for the appellee (defendant in error Office of Chief Disciplinary Counsel).

*Opinion*

MOLL, J. The plaintiff in error, Norman A. Pattis, a Connecticut attorney and counsel of record for the defendants, Alex Emric Jones and Free Speech Systems, LLC,[1] in the underlying consolidated tort actions[2]

---

[1] There were additional defendants who participated in the underlying consolidated actions, including three that Pattis also represented, namely, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC. Jones and Free Speech Systems, LLC, however, were the only remaining defendants at the time of the show cause hearing described in this opinion. We refer in this opinion (1) to Jones and Free Speech Systems, LLC, collectively as the defendants, and (2) to Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, collectively as the Jones defendants.

[2] "The consolidated actions are *Lafferty* v. *Jones*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-18-6046436-

arising out of the mass shooting at Sandy Hook Elementary School, filed this writ of error challenging the order of the trial court suspending him from the practice of law for a period of six months after determining that he had violated the Rules of Professional Conduct. Pattis claims that the court (1) violated his procedural due process rights in initiating, sua sponte, disciplinary proceedings against him, pursuant to its inherent authority to discipline attorneys, on the basis of conduct that occurred outside of its presence, (2) improperly denied his motion to disqualify the Honorable Barbara N. Bellis from presiding over the disciplinary proceedings, (3) improperly determined that he had violated the Rules of Professional Conduct, and (4) imposed an arbitrary and disproportionate disciplinary order. We reject Pattis' first two claims, but we conclude that the court incorrectly found that he violated certain provisions of the Rules of Professional Conduct. Accordingly, we grant in part the writ of error and remand the matter to the court to vacate the improper findings, as well as the attendant disciplinary order, and to conduct a new hearing on sanctions before a different judge.

The following facts and procedural history, as set forth by the trial court in its decision, as set forth by this court in prior decisions, or as are undisputed in the record, are relevant to our resolution of this writ of error. "On December 14, 2012, Adam Lanza entered Sandy Hook Elementary School (Sandy Hook), and thereafter shot and killed twenty first-grade children and six adults, in addition to wounding two other victims who survived the attack. In the underlying consolidated actions, the plaintiffs, consisting of a first

S; *Sherlach* v. *Jones*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-18-6046437-S; and *Sherlach* v. *Jones*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-18-6046438-S." *Lafferty* v. *Jones*, 220 Conn. App. 724, 725 n.2, 299 A.3d 1161 (2023).

responder, who was not a victim of the Sandy Hook shooting but was depicted in the media following the shooting, and the immediate family members of five of the children, one educator, the principal of Sandy Hook, and a school psychologist who were killed in the shooting,[3] brought these separate actions . . . .

"In the complaints, the plaintiffs alleged that [Jones] hosts a nationally syndicated radio program and owns and operates multiple Internet websites that hold themselves out as news and journalism platforms. The plaintiffs further alleged that [Jones] began publishing content related to the Sandy Hook shooting on his radio and Internet platforms and circulated videos on his YouTube channel. Specifically, the plaintiffs alleged that, between December 19, 2012, and June 26, 2017, [Jones] used his Internet and radio platforms to spread the message that the Sandy Hook shooting was a staged event to the millions of his weekly listeners and sub-

---

[3] "There are three underlying actions. In the first action, the plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg. On November 29, 2018, the plaintiffs moved to consolidate the second and third cases . . . with their action pursuant to Practice Book § 9-5. William Sherlach is a plaintiff in the second and third cases and Robert Parker is a plaintiff in the third case. On December 17, 2018, the court granted the motion to consolidate the cases. Jeremy Richman died while this action was pending, and, on June 7, 2021, the court granted the plaintiffs' motion to substitute Jennifer Hensel, executrix of the estate of Jeremy Richman, as a plaintiff in his place; however, on June 8, 2021, Jennifer Hensel, in her capacity as executrix of the estate of Jeremy Richman, withdrew her claims against the defendants. On October 20, 2021, the court granted Erica Lafferty's motion to substitute Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini, in her place as a plaintiff in this case." *Lafferty* v. *Jones*, 222 Conn. App. 855, 858 n.1, 307 A.3d 923 (2023). On December 14, 2023, the court granted a motion to substitute Erica Ash, also known as Erica Lafferty, as a plaintiff in place of Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini. All references in this opinion to the plaintiffs are to the remaining plaintiffs and do not include Jeremy Richman, Jennifer Hensel, as executrix of the estate of Jeremy Richman, or Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini.

scribers. The complaints each consisted of five counts, including causes of action sounding in invasion of privacy by false light, defamation and defamation per se, intentional infliction of emotional distress, negligent infliction of emotional distress,[4] and a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq."[5] (Citation omitted; footnotes added.) *Lafferty* v. *Jones*, 222 Conn. App. 855, 859–60, 307 A.3d 923 (2023).

As the trial court, *Bellis*, *J.*, set forth in its decision, "[o]n February 22, 2019, the court granted [a] motion for protective order filed by the Jones defendants, which allowed, inter alia, the plaintiffs' medical and/or mental health records to be designated as confidential.[6] The

---

[4] The plaintiffs subsequently abandoned the negligent infliction of emotional distress claim.

[5] "On November 15, 2021, the [trial] court [*Bellis*, *J.*] entered a default against the [Jones] defendants as a sanction for failing to fully and fairly comply with the plaintiffs' discovery requests. The [underlying consolidated] cases proceeded to trial for a hearing in damages, and . . . a verdict was reached and a judgment was rendered in each case in favor of the plaintiffs." *Lafferty* v. *Jones*, 222 Conn. App. 855, 860, 307 A.3d 923 (2023). Following the court's denials of postverdict motions, the defendants appealed from the judgments rendered in the underlying consolidated actions, which appeals were consolidated. The consolidated appeal remains pending before this court. See *Lafferty* v. *Jones*, Connecticut Appellate Court, Docket No. AC 46131 (appeal filed December 29, 2022).

[6] "The order limited access to confidential information to the following individuals in this case and all cases consolidated with this case: 'All counsel of record, including staff persons employed by such counsel; the parties, but only to the extent reasonably necessary to the litigation of this case; any consultant, investigator or expert (collectively "Expert") who is assisting in the preparation and/or trial of this action, but only to the extent reasonably necessary to enable such Expert to render such assistance; any deponent or witness who is reasonably believed to have been eligible to have access to Confidential Information by virtue of his or her employment or other affiliation with the Designating Party, and other non-party witnesses deposed in this case but only for the time reasonably necessary to question the witness; court reporters, videographers and outside vendors performing litigation support services for parties in this case; counsel who are presently representing clients in a case against any one or more of the [Jones] Defendants, which arises out of the same or similar set of facts, transactions or occurrences, provided that before disclosing Confidential Information to such counsel, such Defendant (1) must receive notice of the intention to

court order limited the use of such confidential information.[7] On June 16, 2021, the court granted, without objection, the plaintiffs' motion to modify the protective order[8] to create a Highly Confidential-Attorneys Eyes Only designation.[9] Finally, on June 15, 2022,[10] the court granted by consent a final modification to the order of protection,[11] adding 'sensitive information of parties or witnesses, which is ordinarily kept confidential' as a

---

disclose Confidential Information to such counsel; (2) must have the opportunity to move for a protective order in the case in which counsel is involved; and (3) a ruling on the motion for protective order must be issued; and the Court and its personnel.' "

[7] "The protective order stated as follows: 'Except to the extent expressly authorized by this Protective Order, Confidential Information shall not be used or disclosed for any purpose other than the preparation and trial of this case, all cases consolidated with this case, and in any appeal taken from any order or judgment herein.' This 'Limitations on Use' provision can be found in the subsequent modifications to the protective order."

[8] "The motion stated as justification for the modification the fact that the Jones defendants were seeking the plaintiffs' highly personal information such as medical histories and psychiatric records; abusive litigation tactics; and the propensity of Jones to make the plaintiffs' personal information a topic on his show."

[9] "The modified protective order limited access to Highly Confidential-Attorneys Eyes [Only] information to counsel of record, and staff persons employed by such counsel who reasonably need to handle such information; outside consulting experts or testifying expert witnesses, but only to the extent reasonably necessary; any deponent or witness who is reasonably believed to have been eligible to have access to Confidential Information by virtue of his or her employment or other affiliation with the Designating Party, and other non-party witnesses deposed in this case but only for the time reasonably necessary to question the witness, and only to the extent such questioning is reasonably necessary; court reporters, videographers and outside vendors performing litigation support services for parties in this case; and the court and its personnel. The only sharing provision in the order allowed '(c)ounsel who are presently representing clients in a case against any one or more of the [Jones] defendants' to share confidential information with each other, that is, counsel representing plaintiffs in cases against a Jones defendant."

[10] On March 7, 2022, the court granted by consent a motion filed by the plaintiffs to modify the protective order. The modifications were included in the final modification entered on June 15, 2022.

[11] "The plaintiffs, in [a motion to modify the protective order filed on June 13, 2022], stated as follows: 'During the course of discovery, sensitive personal information, which would normally be kept confidential, especially in a case of this degree of public exposure, has been disclosed and/or

category of information which could be designated as confidential.[12] All . . . versions of the protective order required that '(a)ll persons having access to Confidential Information' to 'maintain it in a safe and secure manner.' " (Footnotes added; footnotes in original; footnote omitted.)

"On August 4, 2022, in each of the [underlying] consolidated actions, the . . . court issued, sua sponte, an order requiring . . . Pattis to appear and show cause at a hearing on August 10, 2022, 'as to whether he should be referred to disciplinary authorities or sanctioned by the court directly; see . . . Practice Book [§] 2-45;[13] regarding the purported release of medical records of

discovered.' The plaintiffs were concerned that Jones, or other Jones defendants, would use their personal information publicly, given their view of the conduct of Jones during the course of the litigation."

[12] "The order limited access to Highly Confidential-Attorneys Eyes Only information to the same individuals as the prior order, adding the words 'in this action' to further define 'counsel of record': 'a. Counsel of record in this action, and staff persons employed by such counsel who reasonably need to handle such information; b. Outside consulting experts or testifying expert witnesses, but only to the extent reasonably necessary. Any Party choosing to show such material to such expert shall have the duty to reasonably ensure that such person observes the terms of this Protective Order and shall be responsible upon breach of such duty for the failure of such person to observe the terms of this Protective Order; c. Any deponent or witness who is reasonably believed to have been eligible to have access to Confidential Information by virtue of his or her employment or other affiliation with the Designating Party, and other non-party witnesses deposed in this case but only for the time reasonably necessary to question the witness, and only to the extent such questioning is reasonably necessary; d. Court reporters, videographers and outside vendors performing litigation support services for parties in this case; and The Court and its personnel. No such information shall be disclosed to any other party or person.' "

[13] Practice Book § 2-44 provides: "The Superior Court may, for just cause, suspend or disbar attorneys and may, for just cause, punish or restrain any person engaged in the unauthorized practice of law."

Practice Book § 2-45 provides: "If such cause occurs in the actual presence of the court, the order may be summary, and without complaint or hearing; but a record shall be made of such order, reciting the ground thereof. Without limiting the inherent powers of the court, if attorney misconduct occurs in the actual presence of the court, the Statewide Grievance Committee and the grievance panels shall defer to the court if the court chooses to exercise its jurisdiction."

the plaintiffs, in violation of state and federal statute and th[e] court's protective order, to unauthorized individuals.' The order also directed the clerk 'to notify Chief Disciplinary Counsel, Brian Staines [disciplinary counsel], of the show cause hearing and . . . to immediately provide him with a copy of this order.' Disciplinary counsel had previously filed an appearance." (Footnote added.) *Lafferty* v. *Jones*, 220 Conn. App. 724, 726, 299 A.3d 1161 (2023).

The court held the show cause hearing on August 10, 17 and 25, 2022. Pattis appeared and was represented by counsel, and disciplinary counsel also participated. During the August 10, 2022 hearing, the court, inter alia, (1) stated that it intended to conduct the disciplinary proceedings directly, rather than refer the matter to disciplinary authorities, (2) noted that it had "only learned of [the release of the plaintiffs' confidential records to unauthorized individuals] by reading headlines,"[14] and (3) posed questions that it wanted addressed by the evidence adduced during the hearing. On August 15, 2022, Pattis filed a motion to dismiss the show cause order. On August 16, 2022, Pattis filed a motion to disqualify Judge Bellis from presiding over the disciplinary proceedings. On August 17, 2022, the court denied both motions.

The parties offered evidence during the show cause hearing on August 17 and 25, 2022. Pattis called six character witnesses. Disciplinary counsel called as witnesses (1) Christopher M. Mattei, the plaintiffs' attorney, (2) Federico Andino Reynal, a Texas attorney,[15] and

---

[14] The court further stated: "I am clearly gravely concerned about what I had to hear in headlines on the news. It was never reported to me by counsel that there were any issues. But just what I read in the news."

[15] On August 4, 2022, the court issued a separate show cause order directed to Reynal, who was the subject of an application filed by Pattis to appear pro hac vice in the underlying consolidated cases. The disciplinary proceedings against Reynal are not germane to this writ of error.

(3) Kyung S. Lee, another Texas attorney. Disciplinary counsel also called Pattis as a witness; however, following each of disciplinary counsel's questions, Pattis invoked his right to remain silent pursuant to the fifth amendment to the United States constitution, article first, § 8, of the Connecticut constitution, and General Statutes § 51-35. The court also admitted several exhibits in full, including various email correspondence. The parties subsequently filed posthearing briefs.

On January 5, 2023, the court issued a memorandum of decision, determining, by clear and convincing evidence, that Pattis had violated rules 1.1, 1.15 (b), 3.4 (3), 5.1 (b), 5.1 (c), and 8.4 (4) of the Rules of Professional Conduct. As discipline, the court suspended Pattis from the practice of law for a period of six months.[16] This writ of error followed.[17] Additional facts and procedural history will be set forth as necessary.

## I

Pattis first claims that the trial court violated his rights to procedural due process pursuant to the fifth and fourteenth amendments to the United States constitution[18] in initiating, sua sponte, disciplinary proceedings against him, pursuant to its inherent authority to

---

[16] The disciplinary order is stayed pending the final resolution of this writ of error. See *Lafferty* v. *Jones*, supra, 220 Conn. App. 726–27 n.4 (setting forth procedural background of stay order).

[17] In a docketing statement filed on January 30, 2023, Pattis named disciplinary counsel as the defendant in error. In an amended docketing statement filed the next day, Pattis named Judge Bellis as a second defendant in error. Both disciplinary counsel and Judge Bellis filed motions to dismiss the writ of error. This court (1) granted Judge Bellis' motion to dismiss, dismissing the writ of error as it pertained to her, but (2) denied disciplinary counsel's motion to dismiss. See *Lafferty* v. *Jones*, supra, 220 Conn. App. 731.

[18] Pattis also claims that the court violated his right to procedural due process pursuant to article first, § 8, of the Connecticut constitution. Pattis has not provided a separate state constitutional analysis, and, therefore, we deem his state constitutional claim to be abandoned. See *Glanz* v. *Commissioner of Motor Vehicles*, 210 Conn. App. 515, 521 n.3, 270 A.3d 766 (2022). "In any event, [o]ur Supreme Court has repeatedly held that, as a general rule, the due process clauses of both the United States and Connecticut

discipline attorneys, on the basis of events that tran-
spired outside of its presence, namely, the release of
the plaintiffs' confidential records to unauthorized indi-
viduals. We conclude that this unpreserved claim,
although reviewable, fails on the merits under the third
prong of *State* v. *Golding*, 213 Conn. 233, 239–40, 567
A.2d 823 (1989), as modified by *In re Yasiel R.*, 317
Conn. 773, 781, 120 A.3d 1188 (2015).

The following additional procedural history is rele-
vant to our resolution of this claim. The show cause
order provided in relevant part that Pattis was "ordered
to show cause . . . as to whether he should be referred
to disciplinary authorities or sanctioned by the court
directly, see . . . Practice Book [§] 2-45, regarding the
purported release of medical records of the plaintiffs,
in violation of state and federal statute and th[e] court's
protective order, to unauthorized individuals. . . ." In
his motion to dismiss the show cause order, Pattis
asserted, inter alia, that the court lacked subject matter
jurisdiction or authority to pursue the show cause order
because (1) § 2-45 requires the just cause to occur in
the "actual presence of the court" and (2) the record
reflected that the court learned of the release of the
plaintiffs' confidential records to unauthorized individu-
als through media sources.[19]

On August 17, 2022, the court denied the motion to
dismiss,[20] reasoning that, "[a]n attorney, as an officer of
the court in the administration of justice, is continually

constitutions have the same meanings and impose similar limitations." (Inter-
nal quotation marks omitted.) Id.

[19] In support of his motion to dismiss the show cause order, Pattis further
claimed that (1) there was a bankruptcy stay in effect and (2) the court did
not afford him sufficient notice of the federal and state statutes that he
allegedly violated. Pattis has not raised either issue in this writ of error.

[20] The court heard argument from Pattis' trial counsel on the motion to
dismiss during the August 17, 2022 hearing. Following argument, the court
orally denied the motion to dismiss and stated that a written order would fol-
low.

accountable to it for the manner in which he exercises the privilege which has been accorded him. . . . An attorney must conduct himself or herself in a manner that comports with the proper functioning of the judicial system. . . . The court has the inherent authority to discipline attorneys. . . . Our rules of practice codify the authority of the court to summarily discipline an attorney, without the need to refer the attorney to the disciplinary authorities. . . . Practice Book [§] 2-45 provides that the court has authority to address attorney misconduct that occurs in its presence, and [Practice Book §] 2-32 (a) (2) (F)[21] recognizes that courts may address misconduct occurring in a court action by allowing for the dismissal of a complaint where the complaint alleged misconduct occurring in a court action, and where the court rendered a decision addressing the misconduct. In short, the court has the authority—and jurisdiction—to address attorney misconduct that occurs in a court action. The court rejects [Pattis'] argument that the court can only address misconduct that occurs in the physical presence of the

---

[21] Practice Book § 2-32 (a) provides in relevant part: "Any person, including disciplinary counsel, or a grievance panel on its own motion, may file a written complaint, executed under penalties of false statement, alleging attorney misconduct whether or not such alleged misconduct occurred in the actual presence of the court. Complaints against attorneys shall be filed with the statewide bar counsel. Within seven days of the receipt of a complaint, the statewide bar counsel shall review the complaint and process it in accordance with subdivision . . . (2) . . . of this subsection as follows . . .

"(2) refer the complaint to the chair of the Statewide Grievance Committee or an attorney designee of the chair and to a nonattorney member of the committee, and the statewide bar counsel in conjunction with the chair or attorney designee and the nonattorney member shall, if deemed appropriate, dismiss the complaint on one or more of the following grounds . . .

"(F) the complaint alleges misconduct occurring in a Superior Court, Appellate Court or Supreme Court action and the court has been made aware of the allegations of misconduct and has rendered a decision finding misconduct or finding that either no misconduct has occurred or that the allegations should not be referred to the Statewide Grievance Committee . . . ."

court." (Citations omitted; footnote added; internal quotation marks omitted.)

Pattis acknowledges that the court had the inherent authority to discipline him. See *Disciplinary Counsel* v. *Serafinowicz*, 160 Conn. App. 92, 98, 123 A.3d 1279 ("[t]he Superior Court possesses inherent authority to regulate attorney conduct and to discipline the members of the bar" (internal quotation marks omitted)), cert. denied, 319 Conn. 953, 125 A.3d 531 (2015). Pattis maintains, however, that this inherent authority "is subject to constitutional restraint" and that the court infringed on his procedural due process rights in initiating, sua sponte, disciplinary proceedings against him on the basis of conduct that occurred outside of its presence.

As a preliminary matter, we observe that Pattis raises this procedural due process claim for the first time in this writ of error. Pattis contends that this constitutional claim, if unpreserved,[22] is reviewable under *Golding*. Pursuant to *Golding*, a plaintiff in error "can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error;

---

[22] Pattis asserts that this constitutional claim is preserved because he raised it in the motion to dismiss the show cause order. In the motion to dismiss, Pattis contended in relevant part that (1) the show cause order "[did not] comport with due process" because it failed to identify the specific state and federal statutes that he allegedly violated and (2) the court did not cure the defective notice during the August 10, 2022 hearing. Pattis did not raise the discrete claim, now presented in this writ of error, that the court violated his procedural due process rights in commencing, sua sponte, disciplinary proceedings against him to investigate conduct that did not occur in its presence. Insofar as Pattis claimed error on the ground that the conduct at issue occurred outside of the court's presence, his claim was limited to challenging the court's reliance on Practice Book § 2-45, which the court cited in the show cause order and which concerns just cause "occur[ring] in the actual presence of the court . . . ." See footnote 13 of this opinion. Pattis is not claiming in this writ of error that the court committed error in relying on § 2-45 or that he received defective notice.

(2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [plaintiff in error] of a fair trial; and (4) if subject to harmless error analysis, the [defendant in error] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two steps in the *Golding* analysis address the reviewability of the claim, [whereas] the last two steps involve the merits of the claim." (Emphasis in original; internal quotation marks omitted.) *In re Gabriella M.*, 221 Conn. App. 827, 836, 303 A.3d 319, cert. denied, 348 Conn. 925, 304 A.3d 443 (2023). We conclude that Pattis' unpreserved claim is reviewable, as (1) the record is adequate for review and (2) the claim is of constitutional magnitude alleging the violation of a fundamental right. We further conclude, however, that Pattis' claim fails on the merits under the third prong of *Golding* because he has not demonstrated that the court's actions violated his procedural due process rights.

"Because a license to practice law is a vested property interest and disciplinary proceedings are adversary proceedings of a quasi-criminal nature, an attorney subject to discipline is entitled to due process of law. . . . Due process is inherently fact-bound because due process is flexible and calls for such procedural protections as the particular situation demands. . . . The constitutional requirement of procedural due process thus invokes a balancing process that cannot take place in a factual vacuum. . . . Accordingly, [t]he determination of the particular process that is due depends on the nature of the proceeding and the interests at stake. . . . In attorney disciplinary proceedings, two interests are of paramount importance. On the one hand, we must not tie the hands of grievance committees and trial courts with procedural requirements so strict that it becomes virtually impossible to discipline an attorney

for any but the most obvious, egregious and public misconduct. On the other hand, we must ensure that attorneys subject to disciplinary action are afforded the full measure of procedural due process required under the constitution so that we do not unjustly deprive them of their reputation and livelihood." (Citations omitted; internal quotation marks omitted.) *Burton* v. *Mottolese*, 267 Conn. 1, 19–20, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004).

"[In *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)] [t]he United States Supreme Court . . . set forth three factors [which our Supreme Court has followed] to consider when analyzing whether an individual is constitutionally entitled to a particular judicial or administrative procedure: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. . . . Due process analysis requires balancing the government's interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in those procedures. . . .

"The fundamental requisite of due process of law is the opportunity to be heard . . . [which] must be at a meaningful time and in a meaningful manner. . . . [T]hese principles require that a [litigant] have timely and adequate notice detailing the reasons for [the proposed action], and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." (Citations omitted; internal quotation marks omitted.) *State* v. *Harris*, 277 Conn. 378, 395–96, 890 A.2d 559 (2006).

Whether the court deprived Pattis of his procedural due process rights presents a question of law subject to plenary review. See *Ambrose* v. *Ambrose*, 223 Conn. App. 609, 619, 309 A.3d 305 (2024).

Pattis does not contend that the court deprived him of sufficient notice or of a meaningful opportunity to be heard with regard to the show cause order. Instead, applying the *Mathews* factors, Pattis asserts that, "[i]n order to provide sufficient due process, a court's institution of disciplinary proceedings should . . . [be] limited to conduct that occurs in its presence and not for what a judge might hear or see in the news." We disagree.

With respect to the second *Mathews* factor,[23] Pattis asserts that disciplinary proceedings commenced against an attorney on the basis of a public complaint or inquiry, particularly by the Superior Court, "immediately [jeopardize] the attorney's livelihood" and, when such proceedings are focused on conduct that occurred outside of the court's presence, require investigation and fact-finding. Pattis further contends that the underlying consolidated actions were "highly publicized" and that the show cause order "attracted media attention," such that his "potential discipline became its own national media story before any evidence was put on." Pattis posits that, rather than initiate, sua sponte, disciplinary proceedings against him, the court should have referred the matter to disciplinary authorities, thereby (1) permitting the matter to be investigated privately, "not in public hearings that were part of an already publicized civil case," and (2) providing additional layers of review.

---

[23] As to the first *Mathews* factor, the parties agree that Pattis has a property interest in his law license. See *Burton* v. *Mottolese*, supra, 267 Conn. 19 ("a license to practice law is a vested property interest" (internal quotation marks omitted)).

We are not convinced that the court's course of action risked an erroneous deprivation of Pattis' property interest in his law license. The record demonstrates that the court afforded Pattis notice by way of the show cause order and an opportunity to defend his interest by way of the show cause hearing. Notwithstanding the court's comments reflecting that it had learned of the release of the plaintiffs' confidential records to unauthorized individuals through the news, nothing in the record indicates that the disciplinary proceedings were tainted by publicity surrounding the underlying consolidated actions. Moreover, although the court had the option to refer the matter to disciplinary authorities, we do not discern the court's decision to adjudicate the matter itself as placing Pattis' property interest in his law license at risk of erroneous deprivation. See *Burton* v. *Mottolese*, supra, 267 Conn. 28 (concluding that trial court properly initiated disciplinary proceedings against attorney and that Statewide Grievance Committee is not "exclusive tribunal in which attorney misconduct claims may be investigated").

With respect to the third *Mathews* factor, Pattis maintains that the court's ability to refer the matter to disciplinary authorities mitigated any adverse effect on its interests in managing its docket and in protecting the rights of other parties. We do not agree. The court had a significant interest in immediately adjudicating serious allegations that Pattis had engaged in conduct that led to the release of the plaintiffs' confidential records to unauthorized individuals in violation of the court's protective order. Commencing disciplinary proceedings against Pattis directly, rather than invoking the procedures governing attorney grievance proceedings; see General Statutes § 51-90 et seq.; Practice Book § 2-29 et seq.;[24] enabled the court to inquire promptly into the matter.

[24] "Attorney grievance proceedings are governed by the General Statutes and the rules of practice. See General Statutes § 51-90 et seq.; Practice Book

In sum, after weighing the *Mathews* factors, we are not persuaded that due process mandates the imposition of a constraint on the Superior Court's inherent authority to regulate and to discipline attorneys by drawing a distinction between conduct that occurred before the court and conduct that transpired outside of its presence. We conclude that the court did not violate Pattis' procedural due process rights in initiating, sua sponte, disciplinary proceedings against him on the basis of conduct that occurred outside of its presence,[25] and, therefore, we further conclude that

§ 2-29 et seq." *Brunswick* v. *Statewide Grievance Committee*, 103 Conn. App. 601, 608, 931 A.2d 319, cert. denied, 284 Conn. 929, 934 A.2d 244 (2007).

[25] Pattis argues that "[t]he present case may be the first time in Connecticut that a Superior Court judge instituted disciplinary proceedings against an attorney because she read or saw a report in the news." In support of his position, Pattis cites several disciplinary cases in which trial courts considered whether to discipline attorneys on the basis of conduct that either (1) the courts observed directly or (2) occurred outside of the courts' presence but was brought to the courts' attention by parties or counsel. See *Burton* v. *Mottolese*, supra, 267 Conn. 6, 28 (court initiated disciplinary proceedings against attorney after opposing counsel, during hearing on motion for sanctions, represented to court that one of purported plaintiffs had not authorized attorney to commence action); *Briggs* v. *McWeeny*, 260 Conn. 296, 303, 796 A.2d 516 (2002) (court initiated disciplinary proceedings against attorney after certain parties informed court, during hearing on application for prejudgment remedy, that attorney had engaged in efforts to suppress and to alter architect's report); *Disciplinary Counsel* v. *Williams*, 166 Conn. App. 557, 560, 568, 142 A.3d 391 (2016) (court initiated disciplinary proceedings against attorney on basis of attorney's conduct during trial); *Sowell* v. *DiCara*, 161 Conn. App. 102, 118, 127 A.3d 356 (in adjudicating emergency motion for protective order, court determined that attorney violated Rules of Professional Conduct), cert. denied, 320 Conn. 909, 128 A.3d 953 (2015). These cases do not advance Pattis' contention that, to comport with due process, a trial court may initiate, sua sponte, disciplinary proceedings against counsel *only* when (1) the court observes misconduct in its presence or (2) misconduct that occurred outside of the court's presence is brought to its attention by the parties or counsel. Indeed, adopting Pattis' position would yield absurd results. For instance, pursuant to Pattis' argument, a trial court judge who learns of out-of-court misconduct that affects an ongoing trial, such as witness tampering, would be prohibited from immediately addressing the issue unless it is brought to its attention by a party or counsel. We cannot countenance such a restriction on a

Pattis has failed to demonstrate a violation of his constitutional rights as required under the third prong of *Golding*.[26]

## II

Pattis next claims that Judge Bellis improperly denied his motion to disqualify her from presiding over the disciplinary proceedings. We are not persuaded.

The following additional procedural history is relevant to our resolution of this claim. In a decision dated December 20, 2019, a reviewing committee of the Statewide Grievance Committee dismissed a complaint filed on June 12, 2019, alleging that Pattis had violated the Rules of Professional Conduct in connection with the execution of a personal affidavit of Jones (Jones affidavit), which Pattis filed in the underlying consolidated actions.[27] The reviewing committee found in relevant part as follows. During a hearing on April 10, 2019, Judge Bellis was made aware that Pattis may have acted

court's inherent authority to regulate attorney conduct and to sanction as appropriate.

[26] In the alternative, Pattis requests reversal of the court's judgment pursuant to the plain error doctrine. "The plain error doctrine is based on Practice Book § 60-5, which provides in relevant part: The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . . The plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under [the] plain error [doctrine] unless [he] has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Patel*, 194 Conn. App. 245, 253 n.5, 221 A.3d 45 (2019), aff'd, 342 Conn. 445, 270 A.3d 627, cert. denied sub nom. *Patel* v. *Connecticut*, U.S. , 143 S. Ct. 216, 214 L. Ed. 2d 86 (2022). For the same reasons that we reject his claim under the third prong of *Golding*, we conclude that Pattis has not "met the stringent standard for relief pursuant to the plain error doctrine." Id., 253.

[27] On July 22, 2019, a grievance panel found probable cause that Pattis had violated the Rules of Professional Conduct in relation to his handling of the Jones affidavit.

improperly with respect to the execution of the Jones affidavit, which (1) was signed in Jones' name by Jones' personal representative, who had a power of attorney, and (2) did not state where it was signed. Pattis self-reported the matter by correspondence dated April 12, 2019, and Judge Bellis referred the matter to the Office of Chief Disciplinary Counsel by correspondence dated April 24, 2019.

In dismissing the grievance complaint, the reviewing committee concluded that the record lacked clear and convincing evidence to substantiate a finding that Pattis had violated the Rules of Professional Conduct. The reviewing committee determined that Pattis' "conduct in connection with the [Jones] affidavit did not rise to the level of an ethical violation, in this instance. . . . [Pattis] acknowledged that he made a mistake in connection with the execution of the [Jones] affidavit. When [Pattis] realized his error, he immediately corrected it [by filing a new affidavit signed by Jones]. We find [Pattis] credible that he made a mistake and had no intent to deceive the court or opposing counsel." The reviewing committee further commented that, although it was dismissing the grievance complaint, it was "critical of [Pattis'] level of diligence in researching how to handle an affidavit involving an attorney-in-fact acting under a Texas power of attorney in a Connecticut civil proceeding. It is the opinion of this reviewing committee that [Pattis'] practice was sloppy with regard to the execution of the [Jones] affidavit and that he exercised bad judgment. Further, it was inappropriate not to request the power of attorney document for review."

During the show cause hearing on August 10, 2022, Judge Bellis notified the parties that "in the interest of candor . . . I do intend to handle this matter directly, rather than making a referral to disciplinary authorities." Judge Bellis further stated that she wanted to (1)

"go through the history and the background and lay everything out" in light of the "situation" of counsel representing Pattis, who had recently appeared on behalf of Pattis and who, as Judge Bellis observed, was "not necessarily familiar with the entire background here,"[28] and (2) "go into considerable detail regarding prior disciplinary issues in this case" because she "want[ed] [the disciplinary] proceeding[s] to be fair and transparent . . . ." As part of her recitation of this history, Judge Bellis discussed the reviewing committee's dismissal of the June 12, 2019 grievance complaint. Judge Bellis summarized the background of the complaint and quoted portions of the reviewing committee's decision, including the committee's statements that, notwithstanding its determination that Pattis did not violate the Rules of Professional Conduct, (1) it was "critical" of Pattis' level of diligence, (2) his practice was "sloppy," and (3) "he exercised bad judgment."

In his motion to disqualify Judge Bellis, Pattis claimed that "[i]t is prudent, proper and required under the law for Judge Bellis to be disqualified from hearing this attorney disciplinary proceeding, and for Judge Bellis to proceed is a violation of [his] due process rights." Pattis maintained that (1) Judge Bellis' decision to issue the show cause order could "give rise to the public the improper impression (irrespective of its validity) that the court has improperly chosen sides in litigation," (2) Judge Bellis' comments during the August 10, 2022 hearing (a) reflected that she was "dissatisfied" with the reviewing committee's dismissal of the June 12, 2019 grievance complaint and (b) could "create an improper public perception that [he] may end up being punished

---

[28] Attorney Wesley Robert Mead filed an appearance on behalf of Pattis on August 8, 2022. On the same day, Mead filed a motion for a continuance of the August 10, 2022 hearing on the basis of medical issues. Judge Bellis held the August 10, 2022 hearing; however, to accommodate Mead, she limited the scope of the hearing that day.

not on the merits of these allegations but based on [her] discontent with the [reviewing] committee's prior determination," (3) it would be "troubling" for Judge Bellis to preside simultaneously over "an exceedingly high profile publicized trial" and disciplinary proceedings against him, potentially harming him and the defendants, as well as " 'chill[ing]' " advocacy, and (4) the show cause order left "open the possibility that [he] could have fully complied with the [protective order] but still have violated a federal or state statute governing the release of medical records," in which case (a) compliance with the protective order would be a defense in any ensuing prosecution and (b) Judge Bellis, who had entered the protective order, would "likely be in the position to support the [protective order] . . . ." In denying the motion to disqualify, Judge Bellis stated that "[t]he burden of establishing judicial bias, partiality, or impropriety rests on the movant. The motion is denied as [Pattis] has not met his burden."[29]

Pattis asserts that Judge Bellis improperly denied his motion to disqualify her from presiding over the disciplinary proceedings because her "impartiality could reasonably be questioned" in light of her comments during the August 10, 2022 hearing (1) notifying the parties that she would preside over the disciplinary proceedings, rather than refer the matter to disciplinary authorities, and (2) discussing the reviewing committee's dismissal of the June 12, 2019 grievance complaint.

Initially, we address the standard of review applicable to Pattis' claim. Pattis maintains that Judge Bellis'

_____

[29] Judge Bellis further stated that (1) she would consider the merits of the motion to disqualify notwithstanding that Pattis failed to file the necessary accompanying affidavit or a proper certificate of good faith; see Practice Book § 1-23 ("[a] motion to disqualify a judicial authority shall be in writing and shall be accompanied by an affidavit setting forth the facts relied upon to show the grounds for disqualification and a certificate of the counsel of record that the motion is made in good faith"); and (2) an evidentiary hearing was not necessary because the facts giving rise to the motion were undisputed.

refusal to disqualify herself implicates his due process rights, thereby requiring us to employ plenary review. As our Supreme Court has explained, however, "[t]he United States Supreme Court consistently has held that a judge's failure to disqualify himself or herself will implicate the due process clause only when the right to disqualification arises from *actual bias* on the part of that judge." (Emphasis in original.) *State* v. *Canales*, 281 Conn. 572, 594, 916 A.2d 767 (2007); see also *State* v. *Sumler*, 199 Conn. App. 187, 196–97, 235 A.3d 576 (2020) (citing *Canales* in stating that "[t]he law is clear . . . that the mere appearance of bias is insufficient to implicate a due process violation"), vacated in part on other grounds, 345 Conn. 961, 284 A.3d 982 (2022). Pattis does not assert that Judge Bellis had to be disqualified on the ground of actual bias; indeed, in his principal appellate brief, Pattis cites legal authority for the proposition that "[a] moving party does not need to prove actual bias." We construe the crux of Pattis' claim to be that Judge Bellis should have disqualified herself because her involvement in the disciplinary proceedings would reasonably call into question her impartiality. Thus, Pattis has not presented us with a viable due process claim subject to plenary review.

We proceed to set forth the following relevant legal principles and governing standard of review. "Pursuant to our rules of practice; see Practice Book § 1-22;[30] a judge should disqualify himself [or herself] from acting

---

[30] Practice Book § 1-22 provides in relevant part: "(a) A judicial authority shall, upon motion of either party or upon its own motion, be disqualified from acting in a matter if such judicial authority is disqualified from acting therein pursuant to Rule 2.11 of the Code of Judicial Conduct or because the judicial authority previously tried the same matter and a new trial was granted therein or because the judgment was reversed on appeal. A judicial authority may not preside at the hearing of any motion attacking the validity or sufficiency of any warrant the judicial authority issued nor may the judicial authority sit in appellate review of a judgment or order originally rendered by such authority. . . ."

in a matter if it is required by rule 2.11 of the Code of Judicial Conduct, which provides in relevant part that [a] judge shall disqualify himself [or herself] . . . in any proceeding in which the judge's impartiality might reasonably be questioned . . . . In applying this rule, [t]he reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but whether a reasonable person would question the judge's impartiality on the basis of all the circumstances. . . . Moreover, it is well established that [e]ven in the absence of actual bias, a judge must disqualify himself [or herself] in any proceeding in which his [or her] impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority. . . . Nevertheless, because the law presumes that duly elected or appointed judges, consistent with their oaths of office, will perform their duties impartially . . . and that they are able to put aside personal impressions regarding a party . . . the burden rests with the party urging disqualification to show that it is warranted. . . . A trial court's ruling on a motion for disqualification is reviewed for abuse of discretion. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Footnote added; internal quotation marks omitted.) *Morton* v. *Syriac*, 196 Conn. App. 183, 202–203, 229 A.3d 1129, cert. denied, 335 Conn. 915, 229 A.3d 1045 (2020).

We reject Pattis' claim that Judge Bellis' statements during the August 10, 2022 hearing discussing the reviewing committee's dismissal of the June 12, 2019 grievance complaint[31] and informing the parties of her

_____

[31] Pattis also notes that Judge Bellis, in entering the disciplinary order, deemed the reviewing committee's statements criticizing his handling of the

decision to conduct the disciplinary proceedings directly are sufficient to cause a reasonable person to question her impartiality. Judge Bellis explained on the record that her recitation of the background of the case, including the reviewing committee's dismissal of the June 12, 2019 grievance complaint, constituted an effort to conduct "fair and transparent" disciplinary proceedings and to accommodate Pattis' counsel, who had recently appeared on behalf of Pattis and who had requested a continuance of the proceedings for medical reasons. Judge Bellis further stated that she was notifying the parties of her intent to preside over the disciplinary proceedings directly "in the interest of candor . . . ." Put simply, on the basis of the record, we cannot conclude that Judge Bellis' impartiality might reasonably be questioned. Accordingly, we conclude that Pattis has failed to demonstrate that Judge Bellis abused her discretion in denying his motion to disqualify.[32]

Jones' affidavit to be an aggravating factor. Judge Bellis' comments during the August 10, 2022 hearing do not reflect partiality, and we do not discern her reliance on the reviewing committee's statements in her decision to raise the specter of partiality.

[32] Pattis also contends that Judge Bellis violated his procedural due process rights in failing to refer the disciplinary matter to another Superior Court judge because she had become " 'personally embroiled' " with him. To support this assertion, Pattis cites *Mayberry* v. *Pennsylvania*, 400 U.S. 455, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971), in which the United States Supreme Court vacated a judgment of criminal contempt and remanded the matter to be heard by another judge when the original judge, having been subjected to "slanderous remarks" and "vilified" by the defendant, "necessarily [became] embroiled in a running, bitter controversy" and was not "likely to maintain that calm detachment necessary for fair adjudication." Id., 465–66. The court in *Mayberry* concluded that "by reason of the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment [to the United States constitution] a defendant in criminal contempt proceedings should be given a public trial before a judge other than the one reviled by the contemnor." Id., 466. Even if we assume, without deciding, that the rationale of *Mayberry* extends beyond criminal contempt proceedings, the record does not support Pattis' assertion that Judge Bellis had become " 'personally embroiled' " with him. See *Banks* v. *Thomas*, 241 Conn. 569, 600, 698 A.2d 268 (1997) ("judicial recusal is necessary only in the unusual case where the apparent effect of the contemnor's conduct on the judge against whom the contemptuous

### III

Pattis also claims that the trial court improperly determined that he violated the Rules of Professional Conduct. We (1) reject Pattis' claims that the court improperly determined that he violated rules 1.1, 5.1 (b), and 8.4 (4), as well as rule 5.1 (c) in part, but (2) conclude that the court improperly concluded that he violated rules 1.15 (b) and 3.4 (3), as well as rule 5.1 (c) in part.[33]

The court set forth the following additional facts and procedural history in its decision that are relevant to our resolution of Pattis' claim. "Utilizing a database management firm to ensure that discovery materials were protected and secure, the plaintiffs, beginning in October of 2021, began a rolling [discovery] production. This rolling production was released every two weeks and continued through June of 2022. Every document that was released was reviewed by one of the plaintiffs' attorneys. All discovery materials were provided to the Jones defendants electronically via link, which could be downloaded. The offices of the plaintiffs' counsel, as well as their vendor, had measures in place to keep the materials secure. Medical records, deposition transcripts, and employment, financial, and professional

conduct was levied is such as to indicate that the judge's impartiality or objectivity reasonably may be called into question"). A careful review of the record reveals no remarks or actions by Judge Bellis indicating that she had become entangled personally in a "running, bitter controversy" with Pattis such that her impartiality or objectivity reasonably could be questioned. *Mayberry* v. *Pennsylvania*, supra, 465. Accordingly, we need not address this contention further.

[33] Disciplinary counsel argues that we should decline to review Pattis' claims regarding the court's determinations that he violated rules 1.1, 1.15 (b), 5.1 (b), 5.1 (c), and 8.4 (4) of the Rules of Professional Conduct because they are inadequately briefed. See, e.g., *Colandrea* v. *State Dental Commission*, 221 Conn. App. 597, 620 n.25, 302 A.3d 348 (2023) (inadequately briefed claims are deemed abandoned), cert. denied, 348 Conn. 933, 306 A.3d 475 (2024). We conclude that Pattis' claims as to these particular rules are adequately briefed for our review.

records were among the records of the plaintiffs that were designated [pursuant to the protective order] as Highly Confidential-Attorneys Eyes Only. The plaintiffs produced over 390,000 pages of discovery materials, approximately 4000 of which were the plaintiffs' medical records.

"The concerns of the court with protecting the plaintiffs' medical and confidential information were made painfully clear to [Pattis] early in the discovery process, when [on July 1, 2021] he filed a motion to depose Hillary Clinton, improperly using information designated as Highly Confidential-Attorneys Eyes Only. Most unusually, [Pattis] filed the motion containing the Highly Confidential-Attorneys Eyes Only information as [a] deposition was taking place. In fact, the motion to depose Clinton was filed during the very first of the plaintiffs' depositions. In ruling on the plaintiffs' motion for sanctions filed in response [on July 6, 2021], the court, on August 5, 2021, entered in part the following order: 'Given the cavalier actions and [wilful] misconduct of [Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, which were defendants in the underlying consolidated actions] in filing protected deposition information during the actual deposition, this court has grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public. The court will address sanctions at a future hearing.' Beginning in June of 2021, both the court and the plaintiffs clearly expressed their concerns with respect to protecting the plaintiffs' mental health and other medical and confidential information.

"In late February of 2022, [Pattis] contacted . . . Reynal, a Texas attorney, regarding Reynal's potential representation of Jones and related defendants in five

cases pending in Texas. The expectation was that Reynal would also be working on the three consolidated Connecticut cases, and that the two would collaborate on the Texas and Connecticut cases. In March of 2022, approximately six weeks prior to the then trial date in Texas, Reynal filed an appearance in the Texas Sandy Hook defamation lawsuit brought by Scarlett Lewis and Neil Heslin (Texas case). Reynal was the tenth lawyer for the Jones defendants in the Texas case, initially appearing as cocounsel with Jacquelyn Blott. Blott gave Reynal the files for all five of the Jones defendants' pending Texas cases.

"Reynal continued to communicate with [Pattis], and he requested the text messages produced by the Jones defendants in Connecticut as well as the Jones defendants' Connecticut deposition transcripts. Neither Reynal nor his office ever requested from [Pattis], or from anyone else, the . . . plaintiffs' medical, tax, employment or financial records. Reynal's focus was on preparing for the upcoming Texas trial, which did not require him to review the . . . plaintiffs' records.

"On April 13 [and] 14, 2022, emails were exchanged between [Pattis], Texas attorney . . . Lee, and [prior counsel for the Jones defendants in the underlying consolidated actions, Jay] Wolman, regarding 'Randazza emails.'[34] On April 17, 2022, on the eve of trial in the Texas case, Lee filed a petition for bankruptcy on behalf of [Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC] in the [United States Bankruptcy Court for the Southern District of Texas] (the InfoW bankruptcy case). The plaintiffs' counsel in the Texas and Connecticut Sandy Hook cases filed motions to dismiss the InfoW bankruptcy case, as did the [United States]

---

[34] "Marc Randazza is an attorney admitted in Nevada whose application for pro hac vice [admission] in the Connecticut cases was denied by the court on July 7, 2020. Randazza and a Shelby Jordan were copied on the emails."

Trustee. On April 18, 2022, adversary proceedings were filed in the [United States Bankruptcy Court for the District of Connecticut] . . . and the three consolidated Connecticut cases were removed to Bankruptcy Court.

"On May 2, 2022, Lee emailed Wolman and [Marc] Randazza, reporting on the status of the InfoW bankruptcy case, reporting that Reynal and [Shelby] Jordan had provided him with the discovery in the Texas case, and stating that, when he had asked [Pattis] and [his associate Cameron] Atkinson about the Connecticut discovery, Atkinson recommended that Lee contact Wolman and Randazza directly, as the transfer [of the Connecticut discovery] from Wolman and Randazza to [Pattis] and Atkinson was corrupted.[35] Lee asked Wolman to provide him with all the Connecticut discovery 'by and for each side,' in light of the changing number of lawyers representing the Jones defendants and the status of discovery in both Texas and Connecticut. Lee gave no thought as to what the Connecticut discovery would include and, although he asked for everything, he had no need for the . . . plaintiffs' mental health or other medical records.

"Half an hour later, Wolman responded to Lee by email, stating that, on March 28, 2022, he had given Atkinson a new [hard] drive with several hundred gigabytes, which Atkinson confirmed worked.[36] Wolman suggested that Atkinson's office FedEx the hard drive to Lee and noted that Lee would need to get the . . . plaintiffs' recent compliance from '[Pattis'] team.' Six

[35] "Randazza was not counsel of record in the three consolidated Connecticut cases and as such was not authorized to possess the . . . plaintiffs' confidential information. How Randazza improperly came into possession of the materials was not addressed at the show cause hearing and remains an open issue at this time."

[36] "[Pattis], Jordan, Randazza, Adam Rodriguez (of Lee's firm), and Atkinson were all copied on the email."

minutes later, Wolman emailed Lee again, copying the same five individuals, including [Pattis] and Atkinson, warning that, in light of th[e] court's protective order, Lee might not be authorized to access the . . . plaintiffs' confidential documents.[37]

"Lee responded to Wolman five minutes later, copying the same five individuals, including [Pattis] and Atkinson, thanking Wolman and confirming that he would 'look into the confidentiality situation in the Connecticut litigation.' A few minutes later, Lee emailed [Adam] Rodriguez, asking him to locate the confidentiality order, and asking [Pattis] and Atkinson if they knew what Wolman was referring to.[38] Shortly thereafter, Lee responded to Wolman's email, confirming that he would follow through with Atkinson and [Pattis]. Later that morning, Rodriguez emailed Lee, (copying Atkinson, [Pattis], [Marc] Schwartz, [Robert J.] Shannon, [Raymond] Battaglia, and Jordan), attaching the Connecticut protective orders and highlighting the Highly Confidential-Attorneys Eyes Only language.

"Neither [Pattis] nor anyone from his firm advised of the existence of the protective order, asked Lee to sign a confidentiality order, or responded to Wolman's warning or Lee's inquiry about the protective order. Similarly, neither [Pattis] nor anyone from his firm

[37] "The entirety of the email is as follows:

"Kyung,

"I should also add a caveat (and a word of precaution to [Pattis]) before the drive or other files are sent to you. Under the confidentiality order in the [Connecticut] case[s], I'm not confident you're eligible to receive documents marked by the plaintiffs as Confidential or [Highly Confidential-Attorneys Eyes Only]. As I am not counsel of record, I don't feel comfortable making any decisions that would implicate the order and potentially expose the clients to any liability.

"Sincerely,

"Jay Wolman."

[38] "Atkinson, [Pattis], one Marc Schwartz, [Robert J.] Shannon [who had filed a notice of appearance in the InfoW bankruptcy case], one [Raymond] Battaglia, and Jordan were copied on the email."

informed Lee that they were sending him the . . . plaintiffs' mental health records, medical records, or other such sensitive information. Instead, shortly after this May 2, 2022 email exchange, Lee received at his Houston [Texas] office a white external hard drive in a bubble wrap envelope, along with an undated cover letter from Atkinson to Lee, enclosing the hard drive— the same hard drive that [Pattis] and Atkinson had obtained from Randazza and Wolman. Neither the envelope nor the hard drive was designated or marked in any way as confidential or protected by court order, despite the fact that the hard drive contained the . . . plaintiffs' Highly Confidential-Attorneys Eyes Only medical records and discovery. The cover letter was similarly silent. Lee was unsuccessful in his efforts to download the hard drive.

"On May 6, 2022, the plaintiffs' counsel in both the Texas and Connecticut cases notified Lee of their intention to withdraw their claims against [Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC]. On May 31, 2022, [Pattis] moved to withdraw his and Atkinson's appearances in the Connecticut cases, representing that they had been discharged.[39] On June 1, 2022, the Connecticut cases were remanded back to state court. On June 6, 2022, the [United States] Bankruptcy Court for the Southern District of Texas dismissed the InfoW bankruptcy [case] by agreement of the parties, including the [United States] Trustee.

"Sometime between June 1 [and] 15, 2022, at the end of a meeting in [Free Speech Systems, LLC's] conference room in Austin [Texas], Lee handed the hard drive, unmarked, unaltered, and with no envelope, to Reynal.[40] It did not occur to Lee to inform Reynal that the hard

---

[39] "The motion to withdraw appearance was 'withdrawn' on June 20, 2022."

[40] "Like Lee, Reynal was prohibited from possessing the . . . plaintiffs' medical records and other Highly Confidential-Attorneys Eyes Only materials, as he was not an attorney of record in the Connecticut cases."

drive contained the . . . plaintiffs' Highly Confidential-Attorneys Eyes Only information, and Reynal was not asked to sign any confidentiality agreement. Reynal, concerned with what the Jones defendants had produced in Texas compared to what they had produced in Connecticut, subsequently transferred it to his own internal hard drive system. Despite the fact that the hard drive still contained the . . . plaintiffs' Highly Confidential-Attorneys Eyes Only documents, absolutely no care was taken to safeguard the information or to document the details of the transfer of the hard drive. Lee testified that someone from either Reynal['s] or [Pattis'] law firm asked him to transfer the hard drive to Reynal, and Reynal testified that he either asked for the hard drive or Lee volunteered it. On June 15, 2022, Atkinson emailed Lee, asking Lee to 'make the [hard drive] available' to Reynal. Lee responded by saying that he had already given it to Reynal. A day or two later, at the request of [Pattis'] office, Reynal had the hard drive shipped back to [Pattis].[41] Thus, the . . . plaintiffs' sensitive information, which should have been safeguarded and which was also protected by the court order, was carelessly passed around from one unauthorized person to another, without regard for the protective order, and with no effort to safeguard the . . . plaintiffs' sensitive, confidential documents. The confidential, court-protected medical and other records of the . . . plaintiffs were improperly and unsafely transmitted at the direction of [Pattis] to Lee, and then improperly and unsafely transferred by Lee to Reynal, with [Pattis'] approval.

"On July 6, 2022, [Pattis] filed an application for Reynal to appear pro hac vice in the Connecticut cases. The application was granted on July 20, 2022, with certain restrictions and the requirement that Reynal file an appearance by July 30, 2022. On July 26, 2022, the court

---

[41] "Incredibly, both Lee and Reynal deny ever looking at the materials."

granted [Pattis'] oral motion to 'withdraw' Reynal's pro hac admission, before Reynal filed his appearance.

"In the meantime, on July 22, 2022, Reynal's assistant, at his request, emailed Mark Bankston, lead counsel [for the plaintiffs] in the Texas case, with a link to a 'gofile.me' archive containing supplemental production. However, the link that was sent mistakenly provided access to other materials, including Jones' previously undisclosed text messages, as well as the . . . plaintiffs' Highly Confidential-Attorneys Eyes Only medical records and discovery. The directory consisted of an unusually large number of highly disorganized folders and files. Bankston, having concluded that the materials contained the . . . plaintiffs' confidential documents, as well as [Pattis'] work product, stopped his review and emailed Reynal, alerting Reynal that the documents appeared to include records of the . . . plaintiffs and confidential and work product documents.

"The following morning, Reynal responded to Bankston by email, telling him to disregard the link, indicating that a mistake had been made. Reynal instructed his assistant to deactivate the link but did not address with Bankston the documents that Bankston's office had already downloaded.

"On July 24, 2022, Bankston called . . . Mattei . . . alerting him of Reynal's potential disclosure of the . . . plaintiffs' confidential documents. Bankston informed Mattei that, under [rule 193.3 of the Texas Rules of Civil Procedure], the inadvertent production rule, Bankston was prohibited from examining the records until the ten day 'clawback' period in the rule had expired. Bankston reassured Mattei that he had sequestered the records and would delete them once he came across them.[42]

---

[42] "Under the [inadvertent production] rule, Reynal had ten days from the July 22, 2022 notification by Bankston to identify the material inadvertently produced and assert a privilege."

On July 28, 2022, Mattei emailed Reynal, stating that Reynal remained bound by the court's protective order, despite Reynal's not having filed an appearance; [Pattis] was copied on this email.

"On July 29, 2022, [Free Speech Systems, LLC] filed for bankruptcy in the [United States Bankruptcy Court for the Southern District of Texas] on the eve of the Connecticut trial, which was scheduled to commence jury selection on August 2, 2022. On August 2, 2022, [the defendants] removed the remnants of the Connecticut] cases to the [United States Bankruptcy Court for the District of Connecticut].

"The ten day clawback period ended on August 1, [2022] and on August 2, [2022] the privilege having been waived, Bankston and his staff reviewed the materials, confirmed that the . . . plaintiffs' confidential documents had been transmitted to them,[43] and deleted them.[44] On August 3, 2022, during his cross-examination of Jones in the Texas case, and to Reynal's surprise, Bankston used several text messages from Jones' phone contained in the documents inadvertently produced by Reynal. Reynal subsequently reviewed the . . . protective order for the first time. That same day, Mattei emailed Reynal regarding Reynal's disclosure to Bankston and his staff, requesting that Reynal provide him with an itemized list of the documents, the date he received them, the identity of anyone who had access

---

[43] "Had Reynal identified the . . . inadvertently produced documents and timely asserted a privilege, Bankston would have been required under the [inadvertent production] rule to surrender all copies of all inadvertently produced documents pending a ruling by the court in Texas."

[44] "Pursuant to the sharing provision in the protective order, the plaintiffs' counsel had previously, and properly, shared other documents with Bankston. There was no evidence that the records sent by Reynal to Bankston had all been previously shared with Bankston by the plaintiffs' counsel, which would not matter anyway under the terms of the protective order."

to them, and confirmation of their destruction.[45] An hour after that email, [Pattis] texted Mattei, stating, 'Chris. Give me a call. I learned moments ago that my office may have violated protective order. Norm.'

"After trial ended for the day in Texas, Bankston telephoned Mattei, confirming that he had deleted the . . . plaintiffs' confidential documents. That evening, Reynal emailed Mattei, copying [Pattis], indicating that he was 'deeply troubled' by the 'inadvertent disclosure.' Five minutes later, Mattei responded, copying [Pattis] on the email and reiterating the steps he wanted taken. [Pattis] then texted Mattei, stating, 'Hey. So Texas counsel mistakenly turned over stuff to Texas. Do you recall [one Zimmerman] ever having downloaded [Jones'] text messages?'

"On August 4, [2022] Reynal filed an emergency motion for protective order in Texas regarding the inadvertent production.[46] That morning, Mattei emailed [Pattis], pointing out that Reynal was never counsel of record in the Connecticut cases and as such was barred from accessing the . . . plaintiffs' confidential information and requesting further details from [Pattis]. [Pattis] emailed Mattei back an hour later, conceding that Reynal was not counsel of record in this case but positing that Reynal was 'working on the defense of this case and related cases' and therefore authorized to access the records. [Pattis] explained that they gave Reynal and Lee a copy of their file, that Lee turned his over to Reynal and that [Pattis] had asked Reynal to

---

[45] "Bankston was not counsel of record in the Connecticut case[s] and was prohibited from receiving the . . . plaintiffs' Highly Confidential-Attorneys Eyes Only records from any of Jones' defense counsel. Bankston was the third lawyer, after Lee and Reynal, to whom the . . . plaintiffs' confidential records were improperly disseminated."

[46] "The motion was denied, as the court found that the privilege had been waived under [rule 193.3 of the Texas Rules of Civil Procedure]. The court gave Reynal [twenty-four] hours within which to designate any documents as confidential, but Reynal did not make any such confidential designations."

return the file to [Pattis]. [Pattis] stated, 'I directed an associate to send our files to the two attorneys who requested them to defend [Jones]. I did not direct the associate to withhold the [plaintiffs' confidential] information. If that is an error, responsibility for it falls on my shoulders.'[47] A few minutes later, [Pattis] forwarded to Mattei an email from Reynal to [Pattis], expressing Reynal's embarrassment and reporting that Bankston represented to the Texas court that he had destroyed the . . . plaintiffs' records. Mattei then informed Reynal by email that, according to [Pattis], the materials that Reynal had been given by Lee were the confidential materials that [Pattis] had given to Lee, and he requested a sworn affidavit from Reynal. Mattei also emailed [Pattis], requesting sworn affidavits from Reynal and Lee. Reynal emailed Mattei, stating that he was returning all the files to [Pattis], that he had not shared the materials with anyone outside his firm, and that, as he was awaiting the verdict in the Texas case, he could not prepare the requested affidavit.

"On August 8, [2022] Mattei emailed Reynal, and then both [Pattis] and [Pattis'] attorney, reiterating his request for a detailed affidavit. Reynal responded by email the following day, indicating that he was now represented by counsel, and Mattei immediately emailed Reynal's counsel, repeating his request for an affidavit." (Footnotes added; footnotes in original; footnotes omitted.)

On the basis of these largely undisputed facts, the court concluded that "[Pattis] was obligated to safeguard the plaintiffs' sensitive information by identifying it as such, and, when transmitting such information to

---

[47] "[Pattis] also explained that, pursuant to the Texas court order, he was directing that every . . . plaintiffs' deposition, medical record, employment record or any other record provided by the . . . plaintiffs in discovery be designated as confidential and Attorneys Eyes Only. As discussed above, this was never done."

an authorized recipient, informing the recipient accordingly. Furthermore, [Pattis] was bound to comply with the provisions of the protective order, which were clear and unambiguous. [Pattis] was on notice of the need to safeguard the records by virtue of the court's written order stating the court's 'grave concerns' that the . . . plaintiffs' confidential mental health and other medical records would be improperly disseminated, the plaintiffs' counsel's repeated concerns, both orally and in writing, regarding [the plaintiffs'] confidential information, and Wolman's written warning to [Pattis] on March 28, 2022. Despite all of this, [Pattis], incredibly, knowingly released the records to Lee and Reynal. Not only did he improperly release the records to Lee and Reynal, but he did so carelessly, taking no steps to designate the materials as protected by court order, mark them as confidential, or inform the recipients that they were in possession of sensitive and protected documents. Ultimately, [Pattis'] improper dissemination of the records, in conjunction with his failure to maintain the records in a safe and secure manner, led to the . . . plaintiffs' most private information being improperly released to Lee, Reynal, and then Bankston, none of whom were counsel of record in any of the . . . Connecticut cases."

Additionally, on January 11, 2023, the court denied a motion filed by Pattis for a discretionary stay of the disciplinary order. See footnote 16 of this opinion. On January 23, 2023, in compliance with an order from this court, the trial court issued an articulation of its order denying Pattis' motion for stay. In the articulation, the court stated in relevant part that "[t]he evidence forming the basis for the court's decision was overwhelming and largely incontrovertible. The court detailed at great length the facts giving rise to the misconduct. While [Pattis] continues to minimize his misconduct by referring to it as 'a single instance of misconduct' and a

'singular instance of unauthorized disclosure,' this is simply untrue. The court found misconduct because of [Pattis'] abject failure to label or otherwise identify the hard drive as containing protected medical records, or protected by court order. Additionally, the court found that misconduct occurred when [Pattis] intentionally disseminated the protected documents to . . . Lee . . . who was not counsel of record in this matter. The court also found that it was misconduct for [Pattis] to intentionally distribute the records to . . . Reynal, who was not counsel of record in this matter . . . . [Pattis'] references to a 'mistaken records release' is misleading. The only inadvertent record release was by Reynal to . . . Bankston . . . . Additionally, while [Pattis] argues that the only harm was potential and isolated, the court found that the harm was both actual and potential. The plaintiffs in the underlying litigation were actually harmed when their sensitive records, without their consent, were intentionally transmitted by [Pattis] to Lee and then to Reynal, and then inadvertently transmitted by Reynal, who did not know that he had been given them, to Bankston. . . ."

Before turning to Pattis' claims, we set forth the following legal principles and governing standard of review. "In matters concerning review of the decisions of the trial court regarding violations of the Rules of Professional Conduct, our role is to determine if the facts as found are supported by the evidence contained in the record and whether the conclusions that follow are legally and logically correct. . . .

"[I]n a matter involving attorney discipline, no sanction may be imposed unless a violation of the Rules of Professional Conduct has been established by clear and convincing evidence. . . . [C]lear and convincing proof denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the

belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Citation omitted; internal quotation marks omitted.) *Sowell* v. *DiCara*, 161 Conn. App. 102, 123–24, 127 A.3d 356, cert. denied, 320 Conn. 909, 128 A.3d 953 (2015).

Insofar as Pattis' claims require us to interpret the Rules of Professional Conduct, we employ plenary review. See *Cohen* v. *Statewide Grievance Committee*, 339 Conn. 503, 513, 261 A.3d 722 (2021) ("[t]he proper construction of the Rules of Professional Conduct presents a question of law over which our review is plenary"). The rules of statutory interpretation apply when we construe the Rules of Professional Conduct. Id.; see also id., 521. "However, our interpretation of the Rules of Professional Conduct, unlike our interpretation of our statutes and rules of practice, is complicated by the fact that the judges of the Superior Court have also formally adopted the commentary to the Rules of Professional Conduct." Id., 513–14. "Because the commentary to the Rules of Professional Conduct has been formally adopted by the judges of the Superior Court, the rules must be read together with their commentary. Thus . . . we are not prevented from considering the commentary, even if we have not found the relevant language to be ambiguous." Id., 514–15. "[A]lthough we must read the text of the rules and the commentary together, the commentary is not intended to be definitive, authoritative, or limiting but, rather, is intended to be illustrative and to guide our interpretation of the rules." Id., 515; see also Rules of Professional Conduct, scope, p. 3 ("The [c]ommentary accompanying each [r]ule explains and illustrates the meaning and purpose of the [r]ule. . . . The [c]ommentaries are intended as

guides to interpretation, but the text of each [r]ule is authoritative. Commentaries do not add obligations to the [r]ules but provide guidance for practicing in compliance with the [r]ules.").

Mindful of the foregoing caveat, we set forth the following principles of statutory interpretation that guide us in interpreting the Rules of Professional Conduct. "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case . . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning . . . [we] consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . We recognize that terms in a statute are to be assigned their ordinary meaning, unless context dictates otherwise . . . ." (Internal quotation marks omitted.) *Fernandez* v. *Commissioner of Correction*, 193 Conn. App. 746, 759–60, 220 A.3d 216, cert. denied, 333 Conn. 946, 219 A.3d 376 (2019).

A

First, Pattis claims that the court incorrectly determined that he violated rule 1.1 of the Rules of Professional Conduct. Pattis maintains that, as a matter of

law, rule 1.1 is inapplicable to the circumstances of this case. We disagree.

Rule 1.1, titled "Competence," provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." The commentary to rule 1.1 (1) expounds on the requirement that competent representation necessitates reasonably necessary legal knowledge, skill, thoroughness, and preparation,[48] and (2) discusses an attorney's ability to retain or contract with other lawyers, as well as an attorney maintaining competence. Rules of Professional Conduct 1.1, commentary.

In examining the applicability of rule 1.1, the court stated that, "[i]n order to competently represent a client involved in civil litigation, an attorney must be able to responsibly engage in the discovery process, which routinely requires an attorney to safely maintain and securely transmit confidential materials such as medical records, personal identifying information such as Social Security numbers, and account numbers for financial institutions. This obligation to safeguard such sensitive information extends not only to a client's discovery materials but to discovery materials produced by other parties. Additionally, when the court has issued a protective order in a case, a competent attorney must be familiar with its terms. . . .

"At a basic level, attorneys must competently and appropriately handle the discovery of sensitive materials in civil cases. Otherwise, our civil system, in which

---

[48] With respect to thoroughness and preparation, the commentary states in relevant part that "[t]he required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence. . . ." Rules of Professional Conduct 1.1, commentary.

discovery of sensitive information is customary and routine, would simply collapse. Litigants would understandably be unwilling to turn over the sensitive, confidential or protected information that would be needed to fully and fairly litigate a civil case without the assurance that the attorneys, as officers of the court, would safeguard their information."[49] The court proceeded to determine that Pattis, "by clear and convincing evidence . . . in the course of his representation of the Jones defendants, failed to act competently in the handling of the . . . plaintiffs' confidential records in violation of rule 1.1, exposing [Pattis'] clients to possible sanctions and resulting in harm to the plaintiffs, whose confidential records were distributed without their consent."

Pattis contends that, as a matter of law, the court incorrectly applied rule 1.1 because (1) the rule refers to an attorney's representation of a client and makes no mention of an attorney's duty to other persons, and (2) the conduct at issue concerned the release of the *plaintiffs*' confidential records to unauthorized individuals, thereby falling outside of the ambit of the rule. We reject this construction of rule 1.1. Instead, we agree with the court that, to provide competent representation to a client in accordance with rule 1.1, an attorney must responsibly engage in discovery and safeguard sensitive discovery materials, whether provided by the client *or* produced by an opposing party. Indeed, notwithstanding that the court pursued disciplinary action against Pattis, Pattis' conduct ran the risk of subjecting

---

[49] The court also stated in its analysis concerning Pattis' violation of rule 1.1: "While the [underlying consolidated cases], pending on the court's Complex Litigation Docket, were high profile with significant legal issues and clearly fall within the 'major litigation and complex transactions' contemplated by the [commentary to rule 1.1], the complexity of the case played no part in [Pattis'] misconduct. The obligation to safeguard sensitive records is a basic one."

the defendants he represented to sanctions. See *Mac-Calla* v. *American Medical Response of Connecticut, Inc.*, 188 Conn. App. 228, 240, 204 A.3d 753 (2019) ("Although in some circumstances it may be unduly harsh to impute counsel's transgressions to his client, 'our adversarial system [also] requires that the client be responsible for acts of the attorney-agent whom [he] has freely chosen . . . .' *Thode* v. *Thode*, 190 Conn. 694, 698, 462 A.2d 4 (1983); see *Sousa* v. *Sousa*, 173 Conn. App. 755, 773 n.6, 164 A.3d 702 ('[a]n attorney is the client's agent and his knowledge is imputed to the client' . . .), cert. denied, 327 Conn. 906, 170 A.3d 2 (2017)."); see also *MacCalla* v. *American Medical Response of Connecticut, Inc.*, supra, 239–40 (concluding that court did not abuse its discretion in dismissing claims of certain plaintiffs on basis of counsel's actions); cf. *Herrick* v. *Monkey Farm Cafe, LLC*, 163 Conn. App. 45, 52–53, 134 A.3d 643 (2016) (reversing trial court's judgment of nonsuit rendered on basis of counsel's actions).

In sum, we conclude that, as a matter of law, the court correctly applied rule 1.1. Accordingly, Pattis' claim fails.

### B

Second, Pattis claims that the court incorrectly determined that he violated rule 1.15 (b) of the Rules of Professional Conduct. Pattis contends that, as a matter of law, rule 1.15 (b) does not apply to the facts of this case. We agree.

Rule 1.15, titled "Safekeeping Property," provides in relevant part: "(b) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated or elsewhere with the consent of the

client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of seven years after termination of the representation." The commentary to rule 1.15 provides in relevant part that "[a] lawyer should hold property of others with the care required of a professional fiduciary. Securities should be kept in a safe deposit box, except when some other form of safekeeping is warranted by special circumstances. All property that is the property of clients or third persons, including prospective clients, must be kept separate from the lawyer's business and personal property and, if moneys, in one or more trust accounts. Separate trust accounts may be warranted when administering estate moneys or acting in similar fiduciary capacities. A lawyer should maintain on a current basis books and records in accordance with generally accepted accounting practices. . . ." Rules of Professional Conduct 1.15, commentary.

With respect to the applicability of rule 1.15 (b), the court stated that, "[w]hile typically this rule is applied to monetary funds and commingling of funds, the rule expressly refers to '[o]ther property'—property other than money—and extends to property of third persons, which would include the plaintiffs." The court proceeded to determine, by clear and convincing evidence, that Pattis violated rule 1.15 (b) in failing to safeguard the plaintiffs' confidential records.

Pattis asserts that, as a matter of law, the court incorrectly applied rule 1.15 (b) because this provision does not extend to discovery materials, such as the plaintiffs' confidential records, but, rather, concerns the safeguarding of funds and financial information only. Disciplinary counsel argues that rule 1.15 (b), "by its expressed terms, is not limited to funds or financial information." We conclude that discovery materials,

like the plaintiffs' confidential records, are not encompassed by rule 1.15 (b).

"[P]roperty," as used in rule 1.15 (b), is not defined in the rules. See Rules of Professional Conduct 1.0 and 1.15. Under such circumstances, we ordinarily "look to the 'commonly approved usage' of the phrase as found in dictionaries. See, e.g., General Statutes § 1-1 (a); *State* v. *Menditto*, 315 Conn. 861, 866, 110 A.3d 410 (2015)." *Cohen* v. *Statewide Grievance Committee*, supra, 339 Conn. 521. Black's Law Dictionary defines "property" to mean (1) "[c]ollectively, the rights in a valued resource such as land, chattel, or an intangible" and (2) "[a]ny external thing over which the rights of possession, use, and enjoyment are exercised." Black's Law Dictionary (11th Ed. 2019) p. 1470; see also Black's Law Dictionary (6th Ed. 1990) p. 1216 (defining property in relevant part to be "commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value or which goes to make up wealth or estate"). As the term "property" is broadly defined, the phrase "[o]ther property" in rule 1.15 (b) arguably encompasses discovery materials, such as the plaintiffs' confidential records. The rules of statutory construction, however, instruct that terms "are to be assigned their ordinary meaning, *unless context dictates otherwise* . . . ." (Emphasis added; internal quotation marks omitted.) *Fernandez* v. *Commissioner of Correction*, supra, 193 Conn. App. 759–60. Reading rule 1.15 as a whole, we construe "[o]ther property" as used in subsection (b) to exclude discovery materials, including the plaintiffs' confidential records.

Initially, we observe that the vast majority of the provisions of rule 1.15, along with the lengthy commentary to the rule, expressly address, in whole or in part,

matters that are financial in nature. See Rules of Professional Conduct 1.15 (a) (defining certain terminology used in rule); Rules of Professional Conduct 1.15 (b) (discussing attorney's obligation to safeguard "funds" and "[o]ther property," along with retention and preservation of attendant records); Rules of Professional Conduct 1.15 (c) (discussing parameters of attorney's ability to deposit own funds into client trust account); Rules of Professional Conduct 1.15 (d) (discussing attorney's obligation to deposit legal fees and expenses paid in advance into client trust account); Rules of Professional Conduct 1.15 (e) (discussing attorney's obligations (1) to provide notice "[u]pon receiving funds or other property" in which client or third person has an interest, (2) to promptly deliver "any funds or other property that the client or third person is entitled to receive," and (3) to render full accounting regarding such property upon request); Rules of Professional Conduct 1.15 (f) (discussing attorney's possession of property, which, per commentary, includes funds, in which two or more persons have interests); Rules of Professional Conduct 1.15 (g) (discussing attorney's possession of funds on behalf of client to which third party asserts claim); Rules of Professional Conduct 1.15 (h) and (i) (discussing IOLTA accounts); Rules of Professional Conduct 1.15 (j) (discussing lawyer's maintenance and retention of financial records); Rules of Professional Conduct 1.15 (k) (discussing client trust accounts); Rules of Professional Conduct 1.15 (*l*) (discussing format of records maintained under rule); Rules of Professional Conduct 1.15 (m) (discussing maintenance of client trust account records specified in rule upon dissolution of law firm or legal professional corporation); Rules of Professional Conduct 1.15 (n) (discussing maintenance of records specified in rule upon sale of law practice); Rules of Professional Conduct 1.15, commentary.

Returning to the language of rule 1.15 (b), the final sentence of the provision requires attorneys to retain and to preserve "[c]omplete records of . . . account funds and other property . . . for a period of seven years after termination of the representation." With regard to the plaintiffs' confidential records, there are no such "[c]omplete records" to retain and to preserve. Additionally, subsection (j) provides in relevant part that "[a] lawyer who practices in this jurisdiction shall maintain current financial records as provided in this [r]ule and shall retain [various enumerated] records for a period of seven years after termination of the representation . . . ." Rules of Professional Conduct 1.15 (j). Considered together, subsections (b) and (j) indicate that the "[c]omplete records" addressed in subsection (b) refer to financial records of the lawyer or law firm, and not discovery materials produced in litigation.

Subsection (e) of rule 1.15 lends additional support to the conclusion that the plaintiffs' confidential records are not encompassed by subsection (b). Rule 1.15 (e) provides: "Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this [r]ule or otherwise permitted by law or by agreement with the client or third person, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property." It would make little sense to apply this rule to discovery materials. Rather, the rule is clearly intended to capture the receipt of funds or property by the lawyer to be held in escrow. Moreover, the final sentence of subsection (e) refers to an attorney, upon request, rendering a "full accounting" of "any funds or other property that the client or third person is entitled to receive . . . ." Simply put, there can be

no "full accounting" as contemplated by the rule vis-à-vis the plaintiffs' confidential records.

We also observe that the commentary to rule 1.15 does not lend support to the proposition that the plaintiffs' confidential records are included within the meaning of "[o]ther property" in subsection (b). The commentary expressly provides guidance on safekeeping (1) moneys and (2) securities. See Rules of Professional Conduct 1.15, commentary. Neither example of "property" is similar in nature to discovery materials produced during litigation.

In sum, we conclude that the court, as a matter of law, incorrectly applied rule 1.15 (b) to encompass the plaintiffs' confidential records. Accordingly, we further conclude that the court improperly determined that Pattis violated rule 1.15 (b).

C

Third, Pattis claims that the court incorrectly determined that he violated rule 3.4 (3) of the Rules of Professional Conduct. Pattis asserts that there was insufficient evidence to support the court's determination. We agree.

Rule 3.4, titled "Fairness to Opposing Party and Counsel," provides in relevant part: "A lawyer shall not . . . (3) Knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists . . . ." Rule 1.0 (g) of the Rules of Professional Conduct defines "[k]nowingly" as "denot[ing] actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." The commentary to rule 3.4 provides in relevant part that "[t]he procedure of the adversary system contemplates that the evidence in a case is to be marshaled competitively by the contending parties. Fair competition in the adversary system is

secured by prohibitions against destruction or conceal-
ment of evidence, improperly influencing witnesses,
obstructive tactics in discovery procedure, and the like.
. . .” Rules of Professional Conduct 3.4, commentary.

With regard to rule 3.4 (3), the court stated that it
“flatly rejects [Pattis’] arguments in his [posthearing]
brief that any noncompliance with the protective order
was an inadvertent mistake or misinterpretation of the
protective order. [Pattis], who on August 3, 2022, admit-
ted that his office may have violated the protective
order, was unconcerned with the plaintiffs’ confidential
information, as evidenced by his use of [the] same in
his motion to depose Clinton, and by his total disregard
of Lee’s question to him about the protective order.
The court finds by clear and convincing evidence that
[Pattis] knowingly disobeyed the protective order by
failing to keep the [plaintiffs’ confidential] records in
a safe and secure manner and by releasing the protected
records to Lee and [to] Reynal, both unauthorized recip-
ients, in violation of rule 3.4 (3).”

Pattis asserts that the court incorrectly determined
that he violated rule 3.4 (3) because there is not clear
and convincing evidence supporting the court’s finding
that he knowingly violated the protective order. Specifi-
cally, Pattis posits that “[his] conduct and knowledge
constitute at most negligence. The email communica-
tions [in evidence] show only that he did not inform
the recipients of the protective order; they do not show
that he intended to violate it. He also was not aware
of Lee’s or Reynal’s subsequent disclosures. With [his]
knowledge and mindset not established, it was incor-
rect for the trial court to conclude that he violated [rule]
3.4 (3).” Disciplinary counsel argues that the record
establishes that Pattis knowingly violated the protective
order when, notwithstanding the provisions of the pro-
tective order, as well as Wolman’s May 2, 2022 email
addressed to Lee, with Pattis copied, cautioning about

the protective order, Pattis instructed Atkinson to transfer the hard drive containing discovery materials that included the plaintiffs' confidential records. We agree with Pattis.

We iterate that violations of the Rules of Professional Conduct must be established by clear and convincing evidence, which "induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *Sowell* v. *DiCara*, supra, 161 Conn. App. 124. The evidence in the record does not meet this threshold to support the court's finding that Pattis knowingly—that is, with actual knowledge—violated the protective order, which required him to have actual knowledge of the fact that the hard drive transferred by Atkinson to Lee, and later by Lee to Reynal, contained the plaintiffs' confidential information. Both Lee and Reynal testified that they had not requested the plaintiffs' confidential records from Pattis. Although Pattis, in the August 4, 2022 email addressed to Mattei, acknowledged that he (1) "directed an associate to send [their] files" to Lee and to Reynal and (2) "did not direct the associate to withhold the plaintiff[s'] [confidential] information," those statements do not constitute clear and convincing evidence that Pattis had actual knowledge that the discovery materials on the hard drive included the plaintiffs' confidential records. Similarly, Wolman's May 2, 2022 email to Lee, on which Pattis was copied, warning about the protective order, does not show that Pattis knew he was violating the protective order when he directed his associate to send the hard drive to Lee and to Reynal. Moreover, Pattis' August 3, 2022 text message to Mattei, stating that he had "learned moments ago that [his] office may have violated [the] protective order,"

is not indicative of Pattis having knowingly authorized the release of the plaintiffs' confidential records.

In sum, we conclude that the record does not establish by clear and convincing evidence that Pattis knowingly violated the protective order. Accordingly, we further conclude that the court incorrectly determined that Pattis violated rule 3.4 (3).

D

Fourth, Pattis claims that the court improperly determined that he violated subsections (b) and (c) of rule 5.1 of the Rules of Professional Conduct. We agree in part with Pattis' claim that the court improperly determined that he violated rule 5.1 (c).

Rule 5.1 is titled "Responsibilities of Partners, Managers, and Supervisory Lawyers." Subsection (b) of rule 5.1 provides: "A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct." Rule 1.0 (i) defines " '[r]easonable' or 'reasonably,' when used in relation to conduct by a lawyer, [to denote] the conduct of a reasonably prudent and competent lawyer."

Subsection (c) of rule 5.1 provides: "A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if: (1) The lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or (2) The lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action." Under the rules, the term " 'knows' denotes actual knowledge of the fact in question. A person's

knowledge may be inferred from circumstances." Rules of Professional Conduct 1.0 (g).

The commentary to rule 5.1 provides in relevant part that "[s]ubsection (c) expresses a general principle of personal responsibility for acts of another. See also Rule 8.4 (1).[50] Subsection (c) (2) defines the duty of a partner or other lawyer having comparable managerial authority in a law firm, as well as a lawyer who has direct supervisory authority over performance of specific legal work by another lawyer. Whether a lawyer has supervisory authority in particular circumstances is a question of fact. Partners and lawyers with comparable authority have at least indirect responsibility for all work being done by the firm, while a partner or manager in charge of a particular matter ordinarily also has supervisory responsibility for the work of other firm lawyers engaged in the matter. Appropriate remedial action by a partner or managing lawyer would depend on the immediacy of that lawyer's involvement and the seriousness of the misconduct. A supervisor is required to intervene to prevent avoidable consequences of misconduct if the supervisor knows that the misconduct occurred. Thus, if a supervising lawyer knows that a subordinate misrepresented a matter to an opposing party in negotiation, the supervisor as well as the subordinate has a duty to correct the resulting misapprehension.

"Professional misconduct by a lawyer under supervision could reveal a violation of subsection (b) on the part of the supervisory lawyer even though it does not entail a violation of subsection (c) because there was no direction, ratification or knowledge of the violation.

---

[50] Rule 8.4 of the Rules of Professional Conduct provides in relevant part: "It is professional misconduct for a lawyer to: (1) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another . . . ."

. . ." (Footnote added.) Rules of Professional Conduct 5.1, commentary.

In its decision, the court stated that "Atkinson, an associate at [Pattis'] firm and a member of his 'team,' transferred the [plaintiffs'] confidential documents to Lee at the direction of [Pattis]. [Pattis] admitted in his August 4, 2022 email to Mattei that he directed 'an associate' to send their files to 'the two attorneys who requested them' and that he did not instruct the associate to withhold the . . . plaintiffs' confidential information. The court finds by clear and convincing evidence that [Pattis] violated rules 5.1 (b) and 5.1 (c) by directing his associate to transfer the plaintiffs' protected records to Lee and [to] Reynal, both unauthorized recipients, without proper safeguards and without properly notifying Lee and Reynal that the plaintiffs' sensitive and protected information was being transferred. Additionally, the court finds by clear and convincing evidence that [Pattis] violated rule 5.1 (c) as [Pattis], as sponsoring attorney for Reynal, assumed responsibility for Reynal's actions in connection with said records—specifically, Reynal's failure to 'claw back' the records—that [Pattis] had improperly transmitted to Reynal."[51]

---

[51] The court further stated in its decision: "Reynal was admitted to practice in Connecticut pro hac vice by th[e] court on July 20, 2022, and, at that point, [Pattis], as the sponsoring attorney, assumed full responsibility for the actions of Reynal in connection with the matters. Had Reynal filed an appearance, he would have been counsel of record in these actions and, as such, authorized at that point to receive the plaintiffs' confidential records. In fact, [Pattis] skirted the rules and allowed Reynal access to the confidential records before Reynal filed an appearance—in fact, before [Pattis] even filed the application for pro hac vice. [Pattis] cannot escape responsibility here for Reynal's actions in connection with the plaintiffs' protected records, when [Pattis] was the sponsoring attorney for Reynal, allowed Reynal to have the records before Reynal was counsel of record, and took no action to retrieve the records following the July 26, 2022 'withdrawal' of Reynal's pro hac admission."

With respect to the court's determination that he violated subsections (b) and (c) of rule 5.1 while exercising supervisory authority over Atkinson,[52] Pattis contends that, as a matter of law, the court incorrectly applied those provisions because Atkinson was never charged with any misconduct. We disagree, as we do not construe rule 5.1 (b) or (c) to require a predicate showing that Atkinson was charged with violating the Rules of Professional Conduct. On the basis of its findings, we construe the court to have determined implicitly on the record before it that, in light of the improper and unsafe transmission of the plaintiffs' confidential records by Atkinson to Lee at Pattis' direction, (1) Pattis did not make reasonable efforts to ensure that Atkinson conformed to the Rules of Professional Conduct for purposes of rule 5.1 (b), and (2) Atkinson violated the rules for purposes of rule 5.1 (c).[53] Thus, we reject Pattis' contention that the court improperly applied rule 5.1 (b) and (c) vis-à-vis his exercise of supervisory authority over Atkinson.

With regard to the court's determination that he violated rule 5.1 (c) in acting as Reynal's sponsoring attorney in Connecticut, Pattis contends that there is insufficient evidence supporting the court's determination because he "did not have any involvement in Reynal's inadvertent disclosure to Bankston" and "[h]e only found out about the potential disclosures after the fact." We agree with Pattis.

As the commentary to rule 5.1 reflects, unlike subsection (b), subsection (c) requires evidence of "direction, ratification or knowledge of the [supervised attorney's]

---

[52] Pattis concedes that he exercised supervisory authority over Atkinson.

[53] We recognize that Atkinson was not accused by Judge Bellis of violating the Rules of Professional Conduct and that he has not had the opportunity to defend personally against any allegation of a violation. Our discussion herein will have no preclusive effect outside the context of these disciplinary proceedings against Pattis.

violation." Rules of Professional Conduct 5.1, commentary. To support a violation of rule 5.1 (c) (1), the record must demonstrate that Reynal's conduct was (1) ordered by Pattis or (2) ratified by Pattis "with knowledge of the specific conduct . . . ." To support a violation of rule 5.1 (c) (2), the record must establish that Pattis knew of Reynal's conduct "at a time when its consequences [could] be avoided or mitigated but fail[ed] to take reasonable remedial action." There is no evidence demonstrating that Pattis either (1) gave Reynal any directions with regard to the plaintiffs' confidential records, other than requesting that Reynal return the file with the records to him, or (2) ratified Reynal's conduct with knowledge thereof. Moreover, there is not clear and convincing evidence that Pattis knew of Reynal's conduct at a time when the consequences thereof could have been avoided or mitigated by reasonable remedial action. As we explained in part III C of this opinion, there is insufficient evidence to establish that Pattis knowingly authorized the transfer of the plaintiffs' confidential records. Moreover, there is insufficient evidence to demonstrate that Pattis knew, prior to sending the August 3, 2022 text message to Mattei, that the plaintiffs' confidential records had been released. By August 3, 2022, however, as the court found, the ten day clawback period of the inadvertent production rule applicable to the plaintiffs' confidential records in Texas had expired. Accordingly, the evidence is not adequate to support the court's determination that Pattis violated rule 5.1 (c) insofar as he served as Reynal's sponsoring attorney in Connecticut.

In sum, we (1) reject Pattis' claim that the court incorrectly determined that he violated rule 5.1 (b) and (c) insofar as Pattis exercised supervisory authority over Atkinson but (2) conclude that the court improperly determined that Pattis violated rule 5.1 (c) to the

extent that Pattis acted as Reynal's sponsoring attorney in Connecticut.

E

Fifth, Pattis claims that the court improperly determined that he violated rule 8.4 (4) of the Rules of Professional Conduct. Pattis asserts that, as a matter of law, his conduct did not fall within the scope of rule 8.4 (4). We disagree.

Rule 8.4, titled "Misconduct," provides in relevant part: "It is professional misconduct for a lawyer to . . . (4) Engage in conduct that is prejudicial to the administration of justice . . . ." The commentary to rule 8.4 provides in relevant part that, "[a]lthough a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category. . . ." Rules of Professional Conduct 8.4, commentary.

With respect to rule 8.4 (4), the court determined "by clear and convincing evidence that [Pattis'] abject failure to safeguard the plaintiffs' sensitive records, as well as [Pattis'] inexcusable disregard and violation of the clear and unambiguous terms of the protective order, which limited access to the plaintiffs' Highly Confidential-Attorneys Eyes Only documents to counsel of record in the Connecticut state court actions, and which limited the use of said records to 'the preparation and trial of this case, all cases consolidated with this case, and in any appeal taken from any order or judgment herein' violated rule 8.4 [(4)]."

Pattis maintains that the court incorrectly applied rule 8.4 (4) because "[t]he potential failures to properly maintain records or to follow court orders can be

ground[s] for misconduct, but neither affects the trial process or [the] court's own administration of justice" as implicated by rule 8.4 (4). He further posits that there is no evidence establishing that he (1) criticized, insulted, or otherwise attacked the court or (2) attempted to hinder or to obstruct the disciplinary investigation, evidence of which would support finding a violation of rule 8.4 (4). This restrictive interpretation of rule 8.4 (4) is untenable.

Rule 8.4 (4) "prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice . . . . It is well established that members of the bar [must] conduct themselves in a manner compatible with the role of courts in the administration of justice." (Internal quotation marks omitted.) *Notopoulos* v. *Statewide Grievance Committee*, 277 Conn. 218, 235, 890 A.2d 509, cert. denied, 549 U.S. 823, 127 S. Ct. 157, 166 L. Ed. 2d 39 (2006). "[R]ule 8.4 (4) casts a wide net over an assortment of attorney misconduct. . . . Furthermore, our sister states have consistently held that an attorney's mere misrepresentation to a court may result in a violation of rule 8.4 (4)." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Henry* v. *Statewide Grievance Committee*, 111 Conn. App. 12, 24, 957 A.2d 547 (2008); see id., 24 n.11 (summarizing cases in which Connecticut courts and courts in other states upheld findings of rule 8.4 (4) violations). In the present case, Pattis' misconduct in permitting the disclosure to unauthorized individuals of the plaintiffs' personal and sensitive information unilaterally imposed a significant cost on the plaintiffs in their attempt to obtain justice in this matter. In short, Pattis' mishandling of the plaintiffs' confidential records falls within the expansive range of misconduct encompassed by rule 8.4 (4).

In sum, we conclude that, as a matter of law, the court correctly applied rule 8.4 (4). Accordingly, we reject Pattis' claim.

## IV

Pattis' final claim is that the trial court's disciplinary order suspending him from the practice of law for a period of six months was arbitrary and disproportionate. In light of our conclusion in part III of this opinion that the court improperly determined, in whole or in part, that Pattis violated rules 1.15 (b), 3.4 (3), and 5.1 (c) of the Rules of Professional Conduct, we further conclude that (1) the court's disciplinary order, which was not predicated on Pattis' violation of any particular rule, cannot stand, and (2) we must remand the case for a new hearing on sanctions before a different judge. See General Statutes § 51-183c;[54] Practice Book § 1-22 (a); see also *O'Brien* v. *Superior Court*, 105 Conn. App. 774, 797 and n.27, 939 A.2d 1223 (citing Practice Book § 1-22 (a) in remanding case to trial court for further hearing on certain sanctions after concluding that evidence did not establish that plaintiff in error violated two out of four Rules of Professional Conduct), cert. denied, 287 Conn. 901, 947 A.2d 342 (2008).[55]

The writ of error is granted in part and the case is remanded with direction to vacate the trial court's findings that the plaintiff violated Rules of Professional Conduct 1.15 (b), 3.4 (3), and 5.1 (c) in part, as well as the court's disciplinary order, and for further proceedings consistent with this opinion; the writ of error is denied in all other respects.

In this opinion the other judges concurred.

---

[54] General Statutes § 51-183c provides: "No judge of any court who tried a case without a jury in which a new trial is granted, or in which the judgment is reversed by the Supreme Court, may again try the case. No judge of any court who presided over any jury trial, either in a civil or criminal case, in which a new trial is granted, may again preside at the trial of the case."

[55] To be clear, our decision to remand the matter to a different judge should not be construed in any manner as calling into question Judge Bellis' impartiality in conducting the disciplinary proceedings against Pattis.